**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Dennis RODRIGUEZ,**
**Defendant–Appellant.**

**No. 89–3605.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 13, 1990.

Decided Feb. 22, 1991.

Patrick S. Layng, Asst. U.S. Atty., Office of the U.S. Atty. and Barry R. Elden, Asst. U.S. Atty., Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Nathan Diamond–Falk, Chicago, Ill., for defendant-appellant.

Before COFFEY, RIPPLE and KANNE, Circuit Judges.

RIPPLE, Circuit Judge.

Dennis Rodriguez was indicted for violating 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 2114 (robbery of a United States Postal Service letter carrier), and 18 U.S.C. § 924(c)(1) (use of a firearm in a crime of violence). After a jury trial, he was convicted on all three counts. On appeal, Mr. Rodriguez claims that the prosecution failed to prove specified elements of the charged offenses, challenges the admissibility of certain evidence, and contends that the prosecution's summation prejudiced his right to a fair trial. For the following reasons, we affirm the convictions.

I

BACKGROUND

Mr. Rodriguez was a member of the Imperial Gangsters, a Chicago street gang, with the rank of "enforcer." Tr. of July 25, 1989 at 216. One duty of an enforcer was to "discipline" lower-ranked members, or "soldiers," for "[n]ot following orders." *Id.* On February 8, 1988, Mr. Rodriguez "flagged ... down" an automobile driven by Jose DeLeon, a soldier in the same gang. *Id.* at 219. Mr. Rodriguez asked if DeLeon "wanted to make some easy money," and explained that he wanted to take keys from a postal carrier because the leader of their gang "had them sold to a big coke connect [sic]." *Id.* at 223–24. (Mr. Rodriguez later explained to DeLeon that the keys would be used to facilitate the transfer of cocaine by dropping it in a mailbox.) DeLeon initially told Mr. Rodriguez that he wished to "pick up some girls," but immediately changed his mind after Mr. Rodriguez told him to forget those plans. *Id.* at 224.

After driving around for some time in DeLeon's car, the pair spotted Postal Service letter carrier Edward Pyrzynski. Mr. Rodriguez wanted DeLeon to "snatch the keys," but, after DeLeon indicated that the victim was "too big" for him, agreed that

he himself would do it while DeLeon "watch[ed] his back." *Id.* at 232. Mr. Rodriguez gave DeLeon a gun and told him that it was loaded. Both men then left the car, with Mr. Rodriguez approaching the carrier from behind and DeLeon standing fifteen feet away.

Mr. Pyrzynski carried his keys inside his pocket, attached to a chain that in turn was attached to his belt by a leather loop. Mr. Rodriguez grabbed the key chain, pulled it once or twice, and "popped the loop on the holder." *Id.* at 133, 238. Mr. Rodriguez immediately began to flee with Mr. Pyrzynski in pursuit. The two ran past DeLeon. Before the carrier gave up his brief chase, he heard Mr. Rodriguez and DeLeon talking to each other in Spanish. Mr. DeLeon, who still carried the gun that Mr. Rodriguez had given him, encouraged the latter "to stop and knock the mailman out." *Id.* at 240. As Mr. Pyrzynski began to return to his mail cart, he confronted DeLeon. The latter threatened Mr. Pyrzynski with the gun in a successful effort to escape. DeLeon immediately met up with Mr. Rodriguez again, and the pair went to deliver the keys to the leader of their gang.

During the next week, Mr. Pyrzynski made several attempts to help produce a composite picture of the person who took his keys and to identify him through books of photographs of gang members. On February 15, 1988, he identified a photograph of the person who grabbed his keys in a book of mug shots of members of the Imperial Gangsters. Based on that identification, Postal Inspector Gerard Tokarski determined Mr. Rodriguez's address. On the morning of February 17, 1988, Inspector Tokarski and a Chicago police officer went to Mr. Rodriguez's apartment. A woman who identified herself as Kathy Rodriguez allowed them to enter the apartment, but told them that her husband's name was Juan, not Dennis. Later that same day, Inspector Tokarski, a second postal inspector, and two police officers returned to the apartment. About thirty seconds after one of the officers knocked on the door, Kathy Rodriguez opened the door and said, " 'My Dennis just jumped out the window. He's laying in the street.' " Tr. of July 26, 1989 at 349. Inspector Tokarski then found Mr. Rodriguez in an alley outside his apartment building. Mr. Rodriguez was taken to a hospital. A short time later, Mr. Pyrzynski was called to the hospital, where he identified Mr. Rodriguez as the man who had taken his keys.

Based on these events, Mr. Rodriguez was indicted for conspiracy, robbery of a Postal Service letter carrier, and use of a firearm in the commission of a crime of violence.[1] The jury convicted Mr. Rodriguez on all three counts, and the district court sentenced him to sixty months on each count. The sentences for counts one and two were to run concurrently; the sentence on count three was to run consecutively.

## II

### ANALYSIS

#### A. *Sufficiency of the Evidence*

Mr. Rodriguez contends that the government failed to establish two of the elements required to sustain his conviction under 18 U.S.C. § 2114 (robbery of a United States Postal Service letter carrier): use of force or intimidation in the taking of the keys (the robbery element), and placing the victim's life in jeopardy through use of a deadly weapon (the aggravated robbery element).[2] When this court reviews a chal-

---

1. Mr. DeLeon was indicted along with the appellant, but pled guilty to two of the counts and agreed to cooperate with the government prior to Mr. Rodriguez's trial.

2. The statute provides in pertinent part:
   Whoever assaults any person having lawful charge, control, or custody of any mail matter or of any money or other property of the United States, with intent to rob, steal, or purloin such … property of the United States, or robs any such person of … property of the United States, shall, for the first offense, be imprisoned not more than ten years; and if in effecting or attempting to effect such robbery he wounds the person having custody of such … property of the United States, or puts his life in jeopardy by the use of a dangerous weapon, … shall be imprisoned not more than twenty-five years. 18 U.S.C. § 2114.

lenge to the sufficiency of the evidence, it must affirm a conviction if, "viewing the evidence in the light most favorable to the government, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir.1984) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis supplied by *Jackson* Court)); *accord United States v. Williams*, 910 F.2d 1574, 1577 (7th Cir.1990).

### 1. The robbery element

■ The statute itself does not define robbery. However, in a case involving 18 U.S.C.A. § 320, an earlier version of the statute, the Fourth Circuit held that "[t]he word 'rob' is used in its common law sense, that is, it involves the taking, animo furandi, and asportation of property from the person of another against his will by violence or putting him in fear." *Costner v. United States*, 139 F.2d 429, 431 (4th Cir. 1943) (citing *Harrison v. United States*, 163 U.S. 140, 16 S.Ct. 961, 41 L.Ed. 104 (1896)).

Although the amount of force or violence used to take the keys from Mr. Pyrzynski was rather minimal, there was sufficient evidence for a rational trier of fact to conclude that a robbery did occur.[3] Mr. Pyrzynski's key chain was attached to his clothing, and Mr. Rodriguez had to pull the chain once or perhaps twice to snatch the keys. Courts have upheld robbery convictions when the item taken is "so attached to the person or his clothes as to require some force to effect its removal." 2 W. LaFave & A. Scott, Jr., *Substantive Criminal Law* § 8.11(d)(1) at 446 (1986) (citing cases).[4]

### 2. The aggravated robbery element

■ We also must reject Mr. Rodriguez's contention that the government failed to prove the aggravated robbery element because "[t]he taking of the keys had already been accomplished and the crime completed when DeLeon threatened the letter carrier with the gun." Appellant's Br. at 14. Although DeLeon testified that he took the gun out of his sweater pocket only after Mr. Pyrzynski stopped chasing Mr. Rodriguez, DeLeon was armed and standing nearby, watching Mr. Rodriguez's back, from the moment the incident began. Indeed, Mr. Rodriguez had brought the weapon to the scene and given it to his confederate to carry in the confrontation with Mr. Pyrzynski. The ready availability of the gun likely emboldened Mr. Rodriguez and DeLeon, even if, at first, the gun was not drawn.[5] Certainly, the presence of

---

Mr. Rodriguez also contends that, if this court reverses his conviction on this count, it must also reverse his conviction under 18 U.S.C. § 924(c)(1), which provides for additional punishment of anyone who, "during and in relation to any crime of violence ... uses or carries a firearm." That statute defines "crime of violence" as follows:

> (3) For purposes of this subsection the term "crime of violence" means an offense that is a felony and—
>
> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

*Id.* § 924(c)(3). Because of our disposition, *infra,* regarding section 2114, we need not separately address his contention regarding section 924(c)(1).

**3.** *Cf. United States v. Smith*, 553 F.2d 1239, 1242 (10th Cir.1977) ("Whether an assault [under 18

U.S.C. § 2114] occurred in a given case is a question of fact ordinarily to be resolved by the jury under appropriate instructions; not a question of law to be resolved in the first instance by the reviewing court.").

**4.** *See People v. Patton*, 389 N.E.2d 1174, 1175 (Ill.1979) (dicta); *People v. Campbell*, 84 N.E. 1035, 1036 (Ill.1908) (defendant had "jerk[ed] at [victim's] diamond pin or stud, which was fastened in his shirt front"); *State v. Broderick*, 59 Mo. 318, 321 (1875) (defendant had grabbed a watch chain "with sufficient [force] to overcome the resistance of the chain, and break it from the watch"); *Rex v. Mason*, 168 Eng.Rep. 876, 876 (1820) (victim's watch taken when defendant pulled and broke the attached "steel chain, which went round his neck, and which prevented the prisoner from immediately taking the watch").

**5.** Then-judge, now Justice Kennedy, offered a similar analysis of use of a firearm under 18 U.S.C. § 924(c)(1):

the weapon under these circumstances put Mr. Pyrzynski's "life in jeopardy." 18 U.S.C. § 2114. The government is not obliged to prove that a gun held by the perpetrator of a postal robbery is pointed at the victim, just as it is not obliged to prove "that the gun was actually loaded or that the perpetrator of the crime was disposed to use the weapon. The use of a gun is *per se* sufficient cause to impose the enhanced sentence." *United States v. Parker*, 542 F.2d 932, 934 (5th Cir.1976), *cert. denied*, 430 U.S. 918, 97 S.Ct. 1333, 51 L.Ed.2d 597 (1977). Because Mr. Rodriguez was convicted of conspiracy, the jury could properly attribute to him any of the acts committed by his co-conspirator, De-Leon, who pled guilty to robbery. *See Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *United States v. Galiffa*, 734 F.2d 306, 313–14 (7th Cir.1984); *cf. United States v. Osborne*, 630 F.2d 374, 379 (5th Cir.1980) ("if one of the appellants put life in jeopardy, the other was criminally responsible"), *cert. denied*, 450 U.S. 934, 101 S.Ct. 1398, 67 L.Ed.2d 369 (1981).

## B. *Gang Membership*

■ Prior to the selection of jurors, Mr. Rodriguez's counsel made motions in limine to keep out evidence of gang involvement in the crime and of Mr. Rodriguez's street gang membership. An assistant United States attorney (AUSA) argued that allegations regarding gang involvement were "inextricably interwoven" with other aspects of the case. Tr. of July 25, 1989 at 22. The court denied the motions.

Mr. Rodriguez repeats on appeal his challenge to the admission of evidence of his gang membership. Our review of such "rulings is limited to whether the district court abused its discretion." *United States v. Degaglia*, 913 F.2d 372, 375 (7th Cir.1990) (citing *United States v. McNeese*, 901 F.2d 585, 598 (7th Cir.1990); *United States v. Briscoe*, 896 F.2d 1476, 1490 (7th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990)). As this court has explained, an appellant

> carries a heavy burden in challenging the trial court's admission of evidence because " 'a reviewing court gives special deference to the evidentiary rulings of the trial court.' " *United States v. Shukitis*, 877 F.2d 1322, 1327 (7th Cir. 1989) (citation omitted).

*United States v. Barnes*, 909 F.2d 1059, 1069 (7th Cir.1990); *see Briscoe*, 896 F.2d at 1489–90 (quoting *Shukitis*). This standard of review is appropriate because "the district judge, 'who saw and heard the evidence firsthand, can best balance probity and prejudice.' " *Degaglia*, 913 F.2d at 375 (quoting *McNeese*, 901 F.2d at 598).

Because evidence of membership in a street gang is likely to be "damaging to [defendant] in the eyes of the jury," *United States v. Lewis*, 910 F.2d 1367, 1372 (7th Cir.1990), district courts must consider carefully the admissibility of such evidence. Even relevant evidence may be excluded by the district court "if its probative value is substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. Nevertheless, this court has "long recognized that gang membership has probative value under appropriate circumstances." *Lewis*, 910 F.2d at 1372.

We cannot say that the district court abused its discretion in this case when it permitted DeLeon to testify about his own and Mr. Rodriguez's membership in the Imperial Gangsters. Because Mr. Rodriguez allegedly was stealing the keys for his gang's leader, this testimony could have helped the jury understand Mr. Rodriguez's motive for participating in the rob-

---

If the firearm is within the possession or control of a person who commits an underlying crime as defined by the statute, and the circumstances of the case show that the firearm facilitated or had a role in the crime, such as emboldening an actor who had the opportunity or ability to display or discharge the weapon to protect himself or intimidate others, whether or not such display or dis-

charge in fact occurred, then there is a violation of the statute.
*United States v. Stewart*, 779 F.2d 538, 540 (9th Cir.1985); *accord United States v. Ocampo*, 890 F.2d 1363, 1371 (7th Cir.1989); *cf. United States v. Alvarez*, 914 F.2d 915, 919 (7th Cir.1990) ("Any victim of armed robbery will attest to the fact that, fired or not, the attacker's gun presented a substantial risk of the use of force.").

bery.[6] Moreover, DeLeon's testimony about Mr. Rodriguez's position as an enforcer could have helped the jury understand why Mr. Rodriguez approached DeLeon and why the latter, a mere soldier in the gang, quickly agreed to participate in this criminal endeavor. *See United States v. Hattaway*, 740 F.2d 1419, 1425 (7th Cir.) (evidence of gang members' "lifestyle" is admissible when it is "intricately related to the facts of this case"), *cert. denied*, 469 U.S. 1089, 105 S.Ct. 599, 83 L.Ed.2d 708 (1984).

### C. *Mug Shots*

■ During the direct examination of Mr. Pyrzynski, the government introduced into evidence an enlargement of a "double mug shot" of the defendant. Tr. of July 25, 1989 at 149. Mr. Pyrzynski had picked that mug shot from the book of photographs of members of the Imperial Gangsters, which he was shown at a Chicago police station after the robbery. Such evidence poses a readily apparent risk of prejudice:

"The double-shot picture, with front and profile shots alongside each other, is so familiar, from 'wanted' posters in the post office, motion pictures and television, that the inference that the person involved has a criminal record, or has at least been in trouble with the police, is natural, perhaps automatic." Admission of mug-shots, therefore, generally runs headlong into rules of evidence prohibiting the introduction of remarks or testimony regarding the petitioner's bad character or past criminal record.

*United States ex rel. Bleimehl v. Cannon*, 525 F.2d 414, 416–17 (7th Cir.1975) (quoting *Barnes v. United States*, 365 F.2d 509, 510–11 (D.C.Cir.1966)).[7] Nonetheless, the admission of such a photograph is not always error.[8]

The introduction into evidence of the mug shot in this case does not warrant reversal. First, it appears that Mr. Rodriguez's trial counsel did not raise a timely objection,[9] and thus we may reverse only upon a showing of plain error. *See United States v. Hagan*, 913 F.2d 1278, 1282 (7th Cir.1990); Fed.R.Crim.P. 52(b). Mr. Pyrzynski's testimony about the mug shot was relevant to his identification of the defendant. On cross-examination of Mr. Pyrzynski and on cross-examination of Inspector Tokarski, defense counsel pointed out in-

---

**6.** *See United States v. Hawkins*, 823 F.2d 1020, 1023 (7th Cir.1987) (under Rule 403 balancing, testimony that defendant had indicated that he wished to obtain cocaine to be sold by his gang was more probative than prejudicial).

**7.** The court in *Bleimehl* reversed the grant of habeas relief because it could not "say that the probative value of the mug book was far outweighed by the resulting prejudice it may have created." 525 F.2d at 421. The court noted that the standards applicable to direct review of evidentiary issues differed from those applicable to habeas proceedings. *Id.* at 420; *cf. United States v. Reed*, 376 F.2d 226, 228 & n. 2 (7th Cir.1967) (holding that testimony about prison mug shots is prejudicial error and noting the risk of prejudice from introduction into evidence of mug shots); Fed.R.Evid. 404. *See generally* Annotation, *Admissibility, and Prejudicial Effect of Admission, of "Mug Shot," "Rogues' Gallery" Photograph, or Photograph Taken in Prison, of Defendant in Criminal Trial*, 30 A.L.R.3d 908 (1970).

**8.** *See, e.g., United States v. Dunbar*, 767 F.2d 72, 75 (3d Cir.1985) (district court did not abuse its discretion in admitting, for identification purposes, police mug shot of defendant not expressly identified as such); *United States v. Richard-*

son, 562 F.2d 476, 478–79 (7th Cir.1977) (no error to admit mug shot taken at time of arrest: "There was no reference to any past encounters with law enforcement agencies. In view of the necessity of admitting a photograph of Wilson taken near the time of the robbery for comparison with the bank surveillance photographs, the admission of his photograph was proper."), *cert. denied*, 434 U.S. 1021, 98 S.Ct. 746, 54 L.Ed.2d 768 (1978).

**9.** Mr. Rodriguez's counsel did make a hearsay objection when Mr. Pyrzynski first began to testify about his identification. Tr. of July 25, 1989 at 146. However, he raised no objection to the *prejudicial nature* of the testimony. When AUSA Donna Beth More moved to admit the photograph into evidence, defense counsel merely requested permission to see it. *Id.* at 150. Shortly thereafter, counsel raised a relevancy objection to introduction of what he called a "mug shot," *id.* at 151, but the photograph he was then objecting to was one taken of Mr. Rodriguez in the hospital after he jumped from his apartment window, *id.* at 152. *See United States v. Wynn*, 845 F.2d 1439, 1442 (7th Cir.1988) ("Neither a general objection to the evidence nor a specific objection on other grounds will preserve the issue for review.").

firmities in the identification process in an attempt to cast doubt on the credibility of the identification. Moreover, the risk of prejudice was alleviated in this case because the court read to the jury a curative instruction offered by the defendant:

> You will recall that one of the witnesses in this trial testified that he viewed a photograph of the defendant which was shown to him by the police. The police collect pictures of many people from many different sources and for many different purposes. The fact that the police had the defendant's picture does not mean that he committed this or any other crime.

R.58; R.59 (Defendant's Instruction No. 7).[10]

We certainly cannot say that, absent the possible prejudicial effect of the mug shots, the defendant "probably would have been acquitted." *Hagan*, 913 F.2d at 1282. There is sufficient other evidence of the defendant's guilt to preclude reversal under the plain error standard of review. The testimony of both the victim, Mr. Pyrzynski, and the co-conspirator, DeLeon, provided adequate evidence on which the jury could have based its verdict.

### D. *Prosecution Summation Statements*

■ Although Kathy Rodriguez did not testify at trial, evidence was presented regarding her statement that her husband's name was Juan rather than Dennis. The court overruled hearsay objections to this testimony. Prior to closing arguments, Mr. Rodriguez's counsel made a motion in limine to prevent the prosecution from arguing in summation that Mrs. Rodriguez's "statement was an effort . . . to conceal his identity or to conceal his presence in the apartment." Tr. of July 27, 1989 at 441.

The court denied this motion. When AUSA Donna Beth More did refer to Mrs. Rodriguez's statements during her summation, defense counsel again unsuccessfully objected. The court permitted AUSA More to state that Mrs. Rodriguez "knew that her husband, Dennis Rodriguez, committed the robbery of a postal carrier." Supplementary Tr. of July 27, 1989 at 15. The court also denied a motion for a mistrial on this issue. Defense counsel again unsuccessfully objected when the other prosecutor, AUSA Theodore Poulos, made similar statements in his closing argument.

Mr. Rodriguez contends that the prosecution improperly told the jury during closing arguments that Kathy Rodriguez had lied to Inspector Tokarski about her husband's name because she knew her husband was guilty.[11] He claims that these remarks went beyond "fair comments on the evidence, and [were] akin to the presentation of wholly new evidence." Appellant's Br. at 23–24; *see United States v. Doyle*, 771 F.2d 250, 258 (7th Cir.1985); *United States v. Vargas*, 583 F.2d 380, 385 (7th Cir.1978). We review challenges to such prosecutorial statements under the two-part test in *United States v. Swiatek*, 819 F.2d 721, 730 (7th Cir.), *cert. denied*, 484 U.S. 903, 108 S.Ct. 245, 98 L.Ed.2d 203 (1987): "First, we determine whether, considered in isolation, the challenged remark was improper. If so, we reexamine the improper remark in light of the entire record to determine whether the remark deprived the defendant of a fair trial."

There is no doubt that the prosecutors' interpretation of Mrs. Rodriguez's statement was not the only possible explanation of why she lied about her husband's name. The wife of a gang member certainly might lie to police about her husband's name

---

10. *See United States v. Robinson*, 406 F.2d 64, 67 (7th Cir.) (curative instruction "removed any implication of prior criminal activities from the Government's references to 'mug shots[ ]' " in opening statement), *cert. denied*, 395 U.S. 926, 89 S.Ct. 1783, 23 L.Ed.2d 243 (1969); *cf. United States v. Monks*, 774 F.2d 945, 955 (9th Cir.1985) (upholding denial of mistrial motion in case involving passing reference to mug shots and defense rejection of limiting instruction).

11. Mr. Rodriguez also contends that the prosecution made at least four prejudicial references to his gang membership during closing arguments. Because we have already concluded that evidence of gang membership was properly admitted, and because counsel did not renew his objections during closing arguments, these statements do not constitute reversible error. *See United States v. Jungles*, 903 F.2d 468, 479 (7th Cir.1990) (failure to object to prosecutor's statements during closing argument requires plain error standard of review).

without knowing any specifics about crimes he actually or allegedly had committed. However, the prosecutors' statements were a reasonable interpretation of Mrs. Rodriguez's lie, which itself was apparently admitted into evidence as circumstantial evidence of her state of mind.[12] These statements were "sufficiently inferable from the evidence presented to support the prosecutor[s'] closing arguments." *Doyle,* 771 F.2d at 258; *see also United States v. Auerbach,* 913 F.2d 407, 418 (7th Cir.1990) ("the prosecutor's statements were simply a permissible comment upon what the evidence showed and not a statement of his personal opinion regarding the defendant's guilt").[13] We thus conclude that the challenged remarks were not improper. This conclusion makes it unnecessary to reach the second part of the *Swiatek* test. *See Auerbach,* 913 F.2d at 419.

### Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.

---

12. During the trial, Mr. Rodriguez had raised a hearsay objection to this evidence, which the district court overruled. His argument on appeal is that, because this testimony was not offered for the truth of the matter asserted, it was improper to refer to it in closing arguments to imply guilt.

13. Any risk of prejudice was negated when the district court commented, in overruling the objection to AUSA More's characterization of Mrs. Rodriguez's lie, "The jury heard the testimony. The jury will decide the case." Supplementary Tr. of July 27, 1989 at 15.