51 F.3d 276
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff/Appellee,
v.
Frank JIMENEZ, also known as Frankie Jimenez, also known as
Flaco, Defendant/Appellant.
 No. 94-2625.
 United States Court of Appeals, Seventh Circuit.
 Argued Jan. 24, 1995.
Decided March 28, 1995.
 
 Before POSNER, Chief Judge, and CUMMINGS and ROVNER, Circuit Judges.
 
 ORDER
 
 1
 Frank Jimenez, also known as "Flaco," appeals his conviction for conspiracy to possess with intent to distribute cocaine, 21 U.S.C. Sec. 846, use of or causing the use of a firearm in relation to a drug trafficking offense, 18 U.S.C. Secs. 2 and 924(c),[1] and use of a telephone to facilitate the commission of a drug-related felony, 21 U.S.C. Sec. 843. Jimenez seeks a new trial on the grounds of prosecutorial misconduct. He claims that the two prosecutors intentionally deprived him of a fair trial by referring to his alleged relationship with a gang, the Latin Kings, and by introducing unrelated prior bad acts into evidence.
 
 
 2
 From his cell block at the Winnebago County Jail in Rockford, Illinois, Jimenez organized and directed by telephone a conspiracy to rob a drug house of cocaine and money. In December 1992, Jimenez and Marc Geissler discussed the armed robbery of a drug house. On December 21, 1992, Jimenez instructed Geissler to bond Joseph Vega out of the Winnebago County Jail using money that Jimenez would provide. About two days later, Geissler complied with these instructions. Vega admitted at trial that although he had seen Geissler on the street, he had not known the other man previously. Vega approached the FBI to offer his services as an informant. The FBI eventually foiled the planned robbery, which was scheduled for New Year's Eve, but only after Jimenez had used his uncle to supply an AK-47 assault rifle and a Llama .45 caliber pistol to Geissler and Vega. Although Geissler pleaded guilty and testified on behalf of the prosecution at trial, Vega appeared as a witness for the defense and recanted his prior statements concerning Jimenez.
 
 
 3
 Jimenez claims that the prosecution engaged in a systematic scheme to deprive him of a fair trial by repeatedly attempting to elicit improper testimony from witnesses on the stand and by introducing into evidence recorded conversations between Geissler and Vega containing highly prejudicial inadmissible evidence. He also protests the prosecution's use of that evidence in its closing arguments. Jimenez' claims fall into two main categories. The first category involves prosecutorial remarks concerning Jimenez' activity in the Latin Kings and gang intimidation. The second category consists of recorded conversations between Vega and Geissler casually discussing prior bad acts by Jimenez.
 
 
 4
 Attempting to elicit testimony concerning irrelevant prejudicial evidence has been found to constitute reversible error for prosecutorial misconduct. United States v. DeGeratto, 876 F.2d 576, 584-85 (7th Cir.1989). We evaluate a prosecutor's attempt to inject potentially prejudicial evidence by first deciding whether the prosecutor acted improperly, and then, if so, whether in light of the entire trial that conduct deprived the defendant of a fair trial. United States v. Badger, 983 F.2d 1443, 1453-54 (7th Cir.), cert. denied, 113 S.Ct. 2391 (1993) and 114 S.Ct. 76 (1993). Jimenez' defense counsel never objected to any of the alleged errors.[2] Therefore we review the introduction of allegedly improper evidence for plain error.[3] With respect to the use of such evidence in the prosecution's closing remarks, we also review these alleged errors for plain error, since defense counsel made no objection when the evidence was introduced or during argument. See DeGeratto, 876 F.2d at 585.
 
 
 5
 To prove plain error, Jimenez must show (1) that error has occurred, (2) that such error was clear and obvious under the present law and (3) that it has " 'affect[ed] substantial rights,' " which in most cases means that it affected the outcome of the trial. United States v. Rose, 12 F.3d 1414, 1422 (7th Cir.1994) (quoting United States v. Olano, 113 S.Ct. 1770, 1777-78 (1993)). The prosecutorial misconduct must have "an unfair prejudicial impact on the jury's deliberations" that leads the court "to conclude that the error undermined the fairness of the trial and contributed to a miscarriage of justice." United States v. Young, 470 U.S. 1, 16 n. 13 (1985). If these elements are present, then we may in our discretion correct the error if the plain error has "seriously affected the fairness, integrity or public reputation of [the] trial." Rose, 12 F.3d at 1422.
 
 
 6
 In reviewing the introduction of allegedly improper evidence for plain error, we have examined (1) the nature and seriousness of the misconduct, (2) whether the defendant had an opportunity to counter the testimony through further examination, other witnesses and closing arguments, (3) whether a limiting instruction was given at the time or subsequently and (4) the weight of the evidence against the defendant. Badger, 983 F.2d at 1453-54. Furthermore, we may consider whether the attempt to introduce the improper evidence has been invited by the conduct of defense counsel. Cf. id. at 1450 (providing five factor test for determining whether improper comments in closing argument deprived defendant of fair trial) (citation omitted).
 
 A. Jimenez' Gang Membership:
 
 7
 Jimenez claims that the prosecution improperly injected irrelevant, prejudicial material by repeatedly referring to evidence of his alleged gang membership, an intimidating visit to Vega's home by four Latin Kings and a phone call from Jimenez that scared Vega's daughter. He also contends that the prosecution erred by attempting to make Vega admit his fear of reprisal as an informant and by implying that Jimenez had somehow caused Vega to perjure himself at trial.
 
 
 8
 From the opening argument, the prosecution referred to Jimenez' position as "jefe" or chief of the Latin Kings. Throughout the trial, the prosecution pursued the theory that Jimenez had used his gang affiliation to recruit Vega and Geissler and to maintain control over the conspiracy. Although Geissler was not a member in full standing, he was associated with the gang. At one point, Vega agreed with Geissler's statement that Jimenez' sponsorship of Geissler in the gang "gives me some rank." In another conversation, Geissler told a friend, Andrew Lundberg, that he could not talk at the moment because of "my business with my nation," i.e. the robbery for the Latin Kings. When Geissler later introduced Vega to Lundberg, he said, "Drew, this is one of my King brothers, Joe Vega." Vega admitted his own former membership in the gang from 1980 to 1988.
 
 
 9
 The prosecution further introduced evidence of Jimenez' intimidating authority. Geissler testified that Jimenez' position was a factor in his decision to assist in the robbery because "Frankie was not someone I wanted to get mad at me." In a recorded conversation, Vega said that Jimenez had sent Latin Kings to his house because "he thinks we're slow ... draggin'." Vega testified before the grand jury that one of the four men had told him that Jimenez "can always reach out and touch someone, you know, just like in the phone commercial." In a recorded conversation, Vega also said that a telephone call from Jimenez to Vega's daughter had scared her. In its closing argument, the prosecution referred to the visit by the Latin Kings and the phone call as evidence of Jimenez' participation in the conspiracy. It also argued that Jimenez had caused Geissler to carry the weapon by offering him acceptance by his peers, the gang members, and through his authority as jefe.
 
 
 10
 A prosecutor does not engage in misconduct by introducing and commenting on otherwise admissible, relevant evidence of gang membership and fear of gang retaliation, unless he uses it as a "springboard" for more general prejudicial comments inconsistent with the purpose of its admission.[4] United States ex rel. Garcia v. Lane, 698 F.2d 900, 901-02 (7th Cir.1983). We have recognized the admissibility of gang membership for various purposes.[5] In United States v. Rodriguez, 925 F.2d 1049, 1050-51 (7th Cir.1991), a mid-level gang member, Rodriguez, asked a low ranking member, DeLeon, to assist him in robbing a postal carrier of his keys. Both were indicted for conspiracy, robbery of a postal carrier and use of a firearm in a crime of violence. Id. at 1050. DeLeon pleaded guilty and testified against Rodriguez at trial. Id. at 1051 n. 1. In addition to holding that the evidence of membership tended to show Rodriguez' motive for the robbery, this court held that "DeLeon's testimony about Mr. Rodriguez's position as an enforcer could have helped the jury understand why Mr. Rodriguez approached DeLeon and why the latter, a mere soldier in the gang, quickly agreed to participate in this criminal endeavor." Id. at 1053-54.
 
 
 11
 In this case, evidence of their respective affiliations with the Latin Kings would have helped the jury understand why Geissler, at the request of an inmate (albeit his former roommate), would post bail for a stranger and plan a robbery with them both. Furthermore, both the visit by the four Latin Kings to Vega and Jimenez' phone call to Vega's daughter have direct relevance to proving Jimenez' participation in the conspiracy. Pressuring the others to quicken the pace of their activities demonstrates Jimenez' intent to conspire. Thus, introducing this evidence and commenting upon it in closing arguments did not, in this case, constitute prosecutorial misconduct.
 
 
 12
 Jimenez also protests the prosecution's attempts to impeach Vega by questioning him about his fears of being retaliated against by the Latin Kings as an informant. Vega recanted his prior statements concerning Jimenez' participation and threats made by him through the Latin Kings. He said that he had told the FBI he had been threatened in order to receive more money for his services. On cross-examination, the prosecution attempted to impeach Vega both by prior inconsistent statements concerning the visit by the Latin Kings and Jimenez' call to Vega's daughter and by attempting to elicit evidence of bias due to fear. As Special Agent Christopher Cole, a rebuttal witness for impeachment purposes only,[6] explained, Vega had told the FBI that he was afraid of the Latin Kings because he had been exposed as an informant. The FBI gave him money to relocate and assisted him in leaving town. Furthermore, Vega was serving time in a state prison for an unrelated offense and had requested the FBI's assistance in moving him to federal prison. On cross-examination concerning these facts, Vega admitted that he was going to a prison where the Latin Kings rule and that the penalty for being an informant against the Latin Kings was death. However, he denied being afraid.
 
 
 13
 The evidence of Vega's fear of retaliation was used to impeach him on the basis of bias. "Bias ... [describes] the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Bias may be induced by a witness' ... fear of a party, or by the witness' self-interest." United States v. Abel, 469 U.S. 45, 52 (1984). This evidence tended to show that Vega's "testimony was slanted or perhaps fabricated in [Jimenez'] favor." Id. The use of this testimony was not pretextual. See also Gomez v. Ahitow, 29 F.3d 1128, 1139 (7th Cir.1994) (holding that, in habeas case, admission of testimony concerning threats from unknown source against potential witness did not constitute a fundamental miscarriage of justice for procedural default purposes and distinguishing prior habeas cases on grounds that use of evidence was not "pretextual" because it explained witness' ten month delay before contacting authorities), cert. denied, 63 U.S.L.W. 3626 (Feb. 21, 1995) (No. 94-7102).
 
 
 14
 We have held that a prosecutor may not elicit inadmissible hearsay impeachment testimony of implied threats or danger to the witness, but that the admission of the hearsay was harmless error in part because the prosecution did not directly state that the defendant himself had threatened the witness. United States v. Patterson, 23 F.3d 1239, 1249 (7th Cir.1994), cert. denied, 115 S.Ct. 527 (1994). However, in dictum, we referred to the proposition that references to threats or danger to prosecution witnesses from the defendant are improper unless admissible evidence links the threats or danger to the defendant. Id. (citing see United States v. Rios, 611 F.2d 1335, 1349 (10th Cir.1979)). In this case, the prosecution provided admissible substantive and impeachment evidence both showing Vega's fear of the Latin Kings and linking Jimenez to the leadership of that group, which held certain tenets relating to informants. See Abel, 469 U.S. at 47-48, 52-53 (holding that court did not err by permitting impeachment testimony concerning tenets of secret prison gang that required members to commit perjury and murder on each other's behalf). The prosecution did not act improperly.
 
 
 15
 In closing arguments, the prosecution declared that Vega had committed perjury. Initially, the prosecution stated that "[c]learly, Joe Vega committed perjury when he testified before you...." After reviewing the evidence of gang intimidation, the prosecution concluded that the very fact of Vega's perjury corroborated Geissler's testimony that Jimenez was jefe of the Latin Kings. The defense counsel, in its closing argument, argued that Vega, who no longer received income for his services as an informant, had said anything he thought the government would pay money to hear. Defense counsel flatly labeled Geissler a liar. On rebuttal, the prosecution asserted that "[s]omething or someone got to Joe Vega since the government talked to him on Monday. The something, the threat of death, the someone, I don't know...."[7] The prosecutor did not say that a death threat did in fact occur, but instead commented on the credibility of the defendant's sudden attack of conscience in light of the evidence before the jury.
 
 
 16
 "[T]he courts have viewed the direct accusation of the crime of perjury with considerable disfavor." United States v. Reicin, 497 F.2d 563, 573 (7th Cir.1974) (holding that two references to witness perjury induced by defendant were not sufficient to mandate reversal), cert. denied, 419 U.S. 996 (1974). However, in Lindgren v. Lane, 925 F.2d 198, 208 (7th Cir.) (quoting United States v. Craig, 573 F.2d 455, 494 (7th Cir.1977) (citations omitted), cert. denied, 439 U.S. 820 (1978)), cert. denied, 112 S.Ct. 105 (1991), we said once again in dictum that merely calling a defense witness a liar is not improper conduct, if it does not cross the line from hard, but fair argument to an impairment of the " 'calm and detached search for truth....' " See United States v. Goodapple, 958 F.2d 1402, 1409-10 (7th Cir.1992) (holding that prosecutor did not err by attacking veracity of witness because it represented reasonable inference from evidence adduced at trial rather than prosecutor's personal opinion, and noting that prosecutor may even call witness a liar if term is not used excessively). In this case, Vega's testimony on the stand was irreconcilable with his prior recorded statements and his grand jury testimony. The prosecution did not cross the line by arguing that Vega had lied on the stand. Even if it had crossed the line, given the overwhelming evidence against the defendant, the argument did not constitute plain error.
 
 B. Prior Bad Acts:
 
 17
 Jimenez claims that the prosecution engaged in misconduct by improperly introducing a number of prior bad acts that were not admissible under Federal Rules of Evidence 404(b) or 609. In response, the government does not attempt to argue that any of these acts fall within these rules. Instead, the government contends that these prior crimes, wrongs, or acts are "inextricably intertwined" with the evidence regarding the charged offense, and are therefore admissible. United States v. Roberts, 933 F.2d 517, 519 (7th Cir.1991). Thus, any references to such evidence did not amount to misconduct. We review Jimenez' claims for plain error.
 
 
 18
 Jimenez claims that the prosecution improperly entered into evidence a recorded conversation containing Geissler's description of how Jimenez angrily accused Ray Colon,[8] who had arrived late with the proceeds of a robbery, of stealing a portion before the proceeds could be divided up evenly.[9] Vega later testified that Ray Colon was a member of the Latin Kings. In the recorded conversation, Geissler used this incident to explain to Vega why they would take the money directly to Macias' house on Wall Street after the robbery in order to leave Jimenez' half. This evidence of a prior robbery is inextricably intertwined with the evidence as to why Geissler planned to take the proceeds of the robbery immediately to Jimenez' home for distribution, and it thereby helps explain an example of Jimenez' authority over Geissler.
 
 
 19
 In the recorded conversations cited by Jimenez, Geissler also discussed how Jimenez handed him a gun that he put in the mouth of a thief who had stolen his girlfriend's stereo. He further told Vega how Jimenez was present at a time when he pistol-whipped someone. In another conversation, he stated that he had stopped using cocaine for a period of time after last using it with Jimenez.[10] Defense counsel brought up on cross-examination the stereo incident and how Geissler and Jimenez procured and used drugs together. He referred to the stereo incident in his closing argument as evidence that Geissler was merely a braggart. Although he did not directly refer to the pistol-whipping or to the drug use, defense counsel further argued generally in closing that Geissler's statements and testimony concerning his history with Jimenez were lies.
 
 
 20
 If he's lying on the tape, if he's bragging on the tape, if he's implicating Flaco because he's a wannabe, because he wants to show Vega how close he is to Flaco.... [a]nd he says to Vega in the course of the conversations, 'Flaco and I do this. Flaco and I do that....' If he says that on the tapes, and then he says it on the stand, ... are they corroborating each other? The only thing they corroborate is that he said it. It doesn't make it true.
 
 
 21
 Defense counsel's general theme at closing was that these various instances of braggadocio showed that Geissler also lied when he said Jimenez was part of the conspiracy. We find that these pieces of unrelated prejudicial evidence do not rise to the level of plain error, especially because "when a defendant makes a tactical decision not to object to the admission of evidence at trial, we are particularly reluctant to find plain error." Hollenback v. United States, 987 F.2d 1272, 1281 (7th Cir.1993).
 
 
 22
 Jimenez also contests the prosecution's introduction of another recorded conversation, during which Geissler mentioned a potential gang war in the near future[11] and the use of the AK-47 in sixteen murders and nine shootings.[12] We find that Geissler's discussion of the politics behind the potential gang war, in which the rival gang wants "our territory," is relevant to showing the nature of his relationship to the gang. The prejudicial effect of this evidence, although large, does not substantially outweigh its probative value. With respect to the shootings, even assuming arguendo that the evidence of the crimes previously committed by others with the AK-47 is inextricably intertwined[13] with evidence concerning Jimenez' earlier possession and why it had previously been removed from Geissler's house,[14] the reference to the murders is excessively prejudicial. Thus the prosecution improperly introduced the evidence of the AK-47. However, Jimenez has not demonstrated plain error.[15] Defense counsel cross-examined Geissler concerning gang war and the use of the AK-47 in Chicago. In his closing, defense counsel attempted to argue that this evidence showed that Geissler, the Latin King "wannabe," was merely bragging both about these gang activities and Jimenez' participation in the conspiracy. Given that the evidence against Jimenez was overwhelming and that defense counsel apparently chose not to object to this evidence as a tactical decision, the admission of this evidence did not "affec[t] the outcome of the District Court proceedings," and does not in this case constitute plain error. Rose, 12 F.3d at 1422 (quoting Olano, 113 S.Ct. at 1778).
 
 
 23
 AFFIRMED.
 
 
 
 [1]
 In addition to relying on 18 U.S.C. Sec. 2, the prosecution also pursued theories of co-conspirator liability under Pinkerton v. United States, 328 U.S. 640, 647-48 (1946), and constructive possession
 
 
 [2]
 Defense counsel did object to the admission of Vega's grand jury testimony, which had already been introduced on cross-examination to impeach Vega, as non-hearsay substantive evidence under Federal Rule of Evidence 801(d)(1)(A). The court properly found the evidence that had already been heard was also admissible as substantive evidence. See United States v. Dietrich, 854 F.2d 1056, 1061 (7th Cir.1988) (saying that grand jury proceeding is "other proceeding" under Rule 801(d)(1)(A)). Regardless, on appeal, Jimenez does not raise the hearsay objection, but rather argues that this evidence constituted a part of the prosecution's attempt to inflame the jury
 
 
 [3]
 Id. at 1454 (holding that, in case where defense counsel failed to object, unjustified attempt to elicit testimony connecting defendant with prior thefts not supported by the record was not plain error); DeGeratto, 876 F.2d at 584-85 (holding that, where defense counsel failed to object, unjustified attempt to elicit testimony concerning prostitution ring not in evidence constituted plain error)
 
 
 [4]
 A prosecutor will also have acted improperly if he breaches a court's ruling on the permissible use of the evidence. See United States v. Phillips, 914 F.2d 835, 843 (7th Cir.1990). After the trial ended, Jimenez' new attorney filed a "Second Motion for New Trial and/or Motion for Acquittal." The district court at sentencing held that it lacked jurisdiction to entertain the motion and also rejected it on the merits. The court said that although it would not ordinarily have permitted such evidence, "the government had to explain why there was a change [in Vega's testimony]; and as far as I'm concerned, it was, therefore, proper for them to bring in those matters of gang membership and possible threats to him or his family. So, for that limited purpose, that was admissible." (Sent.Tr. at 5 (emphasis added).) However, the record contains no such ruling during the trial, and the court gave no limiting jury instruction. Thus, the prosecution did not violate any ruling
 
 
 [5]
 United States v. Lewis, 910 F.2d 1367, 1372 (7th Cir.1990) (holding that gang membership was relevant to government's joint venture argument and defendant's constructive ownership of firearms); United States v. Hattaway, 740 F.2d 1419, 1425 (7th Cir.) (holding that evidence of gang "lifestyle" was properly admissible because it was intricately related to the facts of case and was relevant to the charges), cert. denied, 469 U.S. 1028 (1984) and 469 U.S. 1089 (1984); United States ex rel. Hairston v. Warden, Illinois State Penitentiary, 597 F.2d 604, 607-08 (7th Cir.) (holding that probative value of evidence of gang activity toward proving motive outweighed danger of undue prejudice), cert. denied, 444 U.S. 881 (1979)
 
 
 [6]
 The district court limited the use of Cole's testimony to impeachment only, but it permitted the grand jury testimony to be entered as substantive evidence over defense counsel's objection on grounds of hearsay. See supra note 2
 
 
 [7]
 The prosecutor continued: "but we do know that on at least one occasion, this defendant, Frank Jimenez, tried to get to his poor Uncle Oscar." Although this language could also imply a death threat, he explained his reference to Oscar Macias by reading from parts of Jimenez' letter to Macias and inferring that Jimenez had attempted to use his family ties to persuade Macias not to testify
 
 
 [8]
 Although the transcript only refers to "Ray" at this point, earlier in the conversation Geissler did mention Ray Colon by name. Ray Colon's name appeared repeatedly during the recorded conversations and testimony, and we infer that Ray does in fact refer to Ray Colon
 
 
 [9]
 At trial, the prosecution moved for the admission of evidence concerning a specific prior robbery under Fed.R.Evid. 404(b). The court declined to admit this evidence except possibly for the purposes of the cross-examination of Jimenez. However, Jimenez did not testify. Although Jimenez contends that this ruling should have excluded this evidence of a prior robbery, the record, although unclear, indicates that this robbery and the excluded robbery were two different robberies. In the excluded robbery, Jimenez and an unnamed accomplice robbed two individuals of cocaine and later removed three kilograms of cocaine from a suitcase at Geissler's house, where Jimenez was living at the time. In the robbery discussed in the transcript, Geissler says he and Vega would immediately have to go from the robbery to Macias' home on Wall Street, because Jimenez became angry during the prior robbery when "Ray didn't go right back over there...." Furthermore, Geissler also stated that "there's a time, okay, before they get there." This reference to "they" implies a second accomplice because it evidently would not have been Jimenez
 
 
 [10]
 We note that Jimenez inserted the indirect reference to cocaine use into a block quote concerning the AK-47. However, the sentence does not refer to the AK-47
 
 
 [11]
 Geissler stated that the truce, which had been signed by city officials and gang leaders after "this little nigger got killed in Cabrini," was ending on January 1. (Tr. at 141.)
 
 
 [12]
 Geissler explained why "they ain't keepin' that motherfucker in my house.... [y]ou know it's the nation's." (Tr. at 140.) He said that he and Jimenez had removed the AK-47 from his house after someone had fired shots at the house because they were afraid that the police would show up and "that fuckin' gun we usin' has killed like 16 (UI) in Chicago. One night, ... me and Frankie took it to Chicago ... and when we went back and got it three days later, ... brother Bear says I got nine of 'em with it." (Tr. at 140-41.) On cross-examination, Geissler explained that he had meant nine shootings, not nine murders
 
 
 [13]
 Cf. Roberts, 933 F.2d at 519-20 (holding that "cautiously edited" evidence of possession of weapon, which omits reference to certain robbery, was inextricably intertwined with evidence regarding offense); United States v. Muhammad, 928 F.2d 1461, 1468 (7th Cir.1991) (holding that evidence of shooting incident, "which was not detailed," was intricately related to resulting arrest of defendant and search of vehicle by police responding to report of shots being fired)
 
 
 [14]
 The trial court ruled that evidence concerning the prior possession of the assault rifle was not Rule 404(b) evidence, but rather was directly relevant to the issue of Jimenez' possession or constructive possession of the weapon. However, the Rule 404(b) notice before the court did not mention these prior crimes
 
 
 [15]
 In an unrelated discussion, the prosecution commented on the danger that the weapons that the defendants planned to use in the armed robbery posed to innocent people. The comment was a permissible inference based on evidence adduced at trial. United States v. Donovan, 24 F.3d 908, 915 & n. 1 (7th Cir.) (holding that prosecutor could comment upon both harmful effect that cocaine had on the lives of two witnesses and videotaped evidence of small child in proximity to cocaine), cert. denied, 115 S.Ct. 269 (1994)