**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**John E. IRVIN and Thomas E. Pastor,
Defendants–Appellants.**

Nos. 95–2829, 95–2879.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 17, 1996.

Decided June 20, 1996.

James Porter (argued), Office of the United States Attorney, Crim. Div., Fairview Heights, IL, for U.S.

Renee E. Schooley, Andrea L. Smith (argued), Office of the Federal Public Defender, East St. Louis, IL, for John E. Irvin.

James J. Gomric, Andrea Smith (argued), Belleville, IL, for Thomas E. Pastor.

Before POSNER, Chief Judge, CUDAHY, and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

John Irvin and Thomas Pastor were convicted by a jury of possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1), and of using and carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c). The defendants appeal their convictions, claiming that certain motorcycle gang evidence should have been excluded under Federal Rule of Evidence 403. We affirm Irvin's conviction and reverse Pastor's conviction and remand Pastor's case for a new trial.[1]

---

1. We note that defendants also argued in their appellate brief that the district court committed plain error by sentencing the defendants based upon the possession of D-methamphetamine, as opposed to L-methamphetamine, when there was no evidence presented as to which type the defendant possessed. L-methamphetamine is a much less potent form of the drug and its posses- sion draws a dramatically lower sentence. At oral argument, however, the defendants abandoned this argument, explaining that it was moot because the nature of the drugs had since been chemically determined to be D-methamphetamine. We therefore do not address this argument.

## I.

On January 5, 1995, an Illinois State Policeman, Trooper Rob Eisenbarger, stopped a Ford Bronco truck with California plates being driven by John Irvin and carrying Thomas Pastor as a passenger. Eisenbarger became suspicious after observing the extreme nervousness of both of the occupants and after receiving conflicting stories as to their travel plans and purposes. He therefore asked and received consent from both Irvin and Pastor to search the car. The search revealed two weapons, each with a loaded magazine or ammunition clip nearby. The Trooper also discovered an opened box of laundry detergent containing eight duct-taped bundles of methamphetamine. At this point both men were placed under arrest and taken to the Illinois State Police Headquarters in Collinsville, Illinois.

At trial, Trooper Eisenbarger stated that he transported Irvin to the station, while another trooper took Pastor to headquarters. Eisenbarger told the jury that on the way to the station, he informed Irvin that an investigator would want to speak to him about the drugs and about the possibility of doing a controlled delivery. Eisenbarger testified that Irvin's response was "that he didn't believe that he could do that, because [ ] they would kill his whole family, meaning the motorcycle gang that he was affiliated with." Irvin also stated, according to Eisenbarger, that a controlled delivery was not possible because Pastor had already made a phone call, and therefore "they" already knew that the police had stopped them on the highway.

Eisenbarger also told the jury that once Irvin and Pastor reached police headquarters, they were photographed as part of the booking procedures. One picture was taken of a large tattoo appearing on Pastor's back. The court did not allow the government to submit the photo to the jury, but the court did allow Eisenbarger to describe the tattoo to the jury. Eisenbarger testified that the tattoo started at the top and center of Pastor's back, near the base of his neck, where there was "a small triangle with the number 69 intertwined." Eisenbarger stated that below this triangle the word "Diablos" was written in a "border display." He explained

that the Diablos were a motorcycle gang. Eisenbarger then described that there was a large devil's head with a hat on it in the center of the tattoo. To the side of the devil's head were the letters M and C, and below the devil's head, near the bottom of Pastor's back, the tattoo said "CONN," meaning Connecticut. Eisenbarger also told the jury that Pastor had the "same basic picture of the devil" tattooed on his left forearm. The defendants objected to this testimony concerning Pastor's gang tattoo and, in fact, had filed a motion in limine to exclude all testimony and references to the defendants' membership in a motorcycle gang or the gang's insignia. The court, however, determined the evidence was admissible to prove a joint venture between the defendants.

Officer Eisenbarger was also responsible for inventorying and processing the evidence gathered from the Bronco and the defendants. He testified that two rings were taken from Irvin, one that said Diablos and one of a devil's head. The rings were admitted into evidence. In addition, a picture of a vest found in the Bronco was introduced. Officer Eisenbarger testified that the insignia on the vest matched the insignia of Pastor's tattoo, and he again described to the jury the triangle with the 69 intertwined, the devil's head, and the word Diablos. He also explained that the symbols in the tattoo and on the vest were the signs of the Diablos motorcycle gang. A picture of a Diablos "greeting card" and a Diablos wallet placed with the narcotics and the guns was excluded, although Eisenbarger was allowed to tell the jury that in the Bronco there was "personal clothing . . . [and] other affiliations to gangs such as business cards and stickers of affiliation to a gang."

Officer Charles Bruggeman then testified that he was asked to interview Irvin at the police station, and as a result of the interview, a written statement was obtained from Irvin. The first three sentences read as follows:

I have been a Diablos for approximately five years, most recently serving as chapter president. The chapter is located in the San Fernando Valley and has eight

members. Prior to joining the Diablos, I grew up with the Hell's Angels in the San Fernando Valley.

Irvin additionally explained in the statement how he had come into possession of the laundry detergent box. He told the officer that he was getting gas at a station in Illinois when a man approached him pulling a laundry cart. This man offered Irvin the box of detergent, telling him he didn't want it anymore. At first Irvin refused, but he later accepted the detergent when the man told him that he was just going to throw it away. Irvin also claimed ownership of the guns that were found in the truck. Irvin's statement was read to the jury by Officer Bruggeman.

When Irvin took the stand in his own defense, he told a similar but somewhat different story. He first explained how the laundry detergent box had come to be in the Bronco, basically telling the jury the same story that he had told the police about the man at the gas station. Irvin also testified that he had joined the Diablos motorcycle club about five years ago and that around the same time the club had outlawed the use of drugs. He stated that he did not use drugs and was not involved in the transporting and distribution of drugs. He told the jury that the Diablos rings, the vest, both of the guns, and the rest of the items in the cargo area of the Bronco were his, as he was moving some of his personal things to Indiana. He claimed that he had told both Trooper Eisenbarger and Investigator Bruggeman that he was set up by a former drug-dealing member of the Diablos, who was now a member of another gang, the Sons of Silence. Irvin testified that he was instrumental in getting this person kicked out of the Diablos and he believed this person had the man at the gas station plant the drugs on him. As far as the statement he made to Trooper Eisenbarger about not being able to cooperate because his motorcycle gang would kill him, Irvin testified that he did not say that the Diablos would kill him, but rather that the Sons of Silence would kill him if he tried to set them up. Trooper Eisenbarger admitted on cross examination that Irvin had mentioned this other gang at some point, but he stated it was his recollection that Irvin had said the Diablos would kill him. Irvin testified on cross that Pastor was a retired member of the Diablos.[2] In questioning Irvin, the prosecutor repeatedly referred to the Diablos as a motorcycle "gang," until the court sustained an objection to the use of the term. The prosecutor then asked several questions mocking the use of the term motorcycle "club," before resuming the use of the word "gang."

During the rebuttal portion of his closing argument, the prosecutor argued that Pastor was linked to the crimes by stating:

> [Pastor], a member of the Diablos motorcycle gang who after ten years retires with full privileges ... retired member with full privileges and honors is riding along with an active member, the president of the chapter, and this is a club by the way, not a motorcycle gang, they don't wear colors, dirty, nasty colors and do things. They are a club, an upstanding social group out in California. That once again denies your common sense and logic.

The defendants objected to the comment, but the court allowed it to stand. The jury convicted both Irvin and Pastor on both counts of the indictment.

## II.

Irvin and Pastor appeal the district court's decision to allow into evidence the testimony and exhibits relating to their membership in the Diablos motorcycle gang. The defendants claim that the limited probative value of this evidence was substantially outweighed by its prejudicial effect and therefore should have been excluded under Fed.R.Evid. 403.[3] We review a district court's balancing under Rule 403 under the deferential abuse of discretion standard. *United States v. Butler,* 71

---

2. Pastor never admitted or denied being in the gang, as he made no statement to the police and did not take the stand. The only evidence, apart from Irvin's testimony, that Pastor was a member of the Diablos was the tattoo evidence presented by Eisenbarger.

3. Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...."

F.3d 243, 250 (7th Cir.1995); *United States v. Rodriguez,* 925 F.2d 1049, 1053 (7th Cir. 1991).

 We have consistently held that, under appropriate circumstances, gang evidence has probative value warranting its admission over claims of prejudice. *See Butler,* 71 F.3d at 251 (collecting cases); *United States v. Thomas,* 86 F.3d 647, 652–53 (7th Cir. 1996) (collecting cases). However, we have also long recognized the substantial risk of unfair prejudice attached to gang affiliation evidence, noting such evidence "is likely to be damaging to a defendant in the eyes of the jury" and that gangs suffer from "poor public relations." *United States v. Lewis,* 910 F.2d 1367, 1372 (7th Cir.1990); *Butler,* 71 F.3d at 251. We therefore require careful consideration by district courts in determining the admissibility of gang membership and gang activity evidence. *Butler,* 71 F.3d at 251; *Rodriguez,* 925 F.2d at 1053.

Although the district court did exclude some of the government's proposed gang evidence, we believe that the majority of the gang evidence that was admitted should have been excluded under Rule 403. The probative value of the evidence was minimal. The government argued to the district court that the gang evidence was relevant in establishing a "joint venture" between the defendants to deliver drugs and that it went to "common purpose and common goal." Essentially, the government contended that the defendants' common membership in the motorcycle gang made it more likely that they were involved in the drug transaction together, and thus that they were both in constructive possession of the drugs and both intended to distribute the drugs. The gang evidence would therefore, according to the government, aid in rebutting Pastor's claim that he was simply a passenger in the car with no connection to any of the items in the vehicle, including the drugs. The district court apparently admitted the evidence based on the government's argument, stating:

Since Irvin admitted that he was a member of the Diablos, and since Mr. Pastor had these gang colors and tatoos and everything, that [ ] is evidence from which the jury could find that [Pastor] was a member of the Diablos, that has probative value to establish that both of them were involved in this conspiracy to possess and distribute the drugs . . .

We note that the district court misspoke when it referred to a conspiracy charge. The defendants were not charged with conspiracy; they were individually charged with possession and intent to distribute methamphetamine. The government therefore was not legally required to prove a joint venture or an agreement to distribute drugs, i.e., it was not an element of the charged offense. Establishing such a common endeavor, however, was one way to prove that both Irvin and Pastor individually possessed the drugs and intended to distribute them. Thus, the government had a legitimate reason to pursue the joint venture theory; the question is whether the gang evidence admitted was probative in proving a common venture to distribute drugs.

It may be true that common membership in any group, whether it be a gang or a church group, makes it more likely that two people are involved in a given activity together, illegal or not. The inference is certainly weak, however, if the group itself is not somehow connected to the activity at issue. In other words, the fact that Irvin and Pastor are members of a motorcycle club is not especially probative of whether they jointly ventured to distribute drugs, unless the motorcycle club is shown to be involved with drugs. In this case, we are missing that critical connection linking the motorcycle gang with drug trafficking, or any criminal activity for that matter. The government admitted at oral argument that it did not present any evidence demonstrating that the Diablos was a criminal organization involved in the distribution of drugs.[4]

**4.** This missing link between the gang and the criminal activity at issue distinguishes this case from other cases where gang evidence has been found admissible for the purpose of establishing a joint venture or the existence of a conspiracy.

*See, e.g. Lewis,* 910 F.2d at 1372 (gang evidence admissible to show joint venture and constructive possession of guns where there was direct testimony that guns were possessed specifically for protection against rival gang); *United States*

The government could have argued that Irvin's statement to Trooper Eisenbarger that he could not cooperate in a controlled buy because his motorcycle gang would kill him implicates the gang in the drug activity. But the government did not make this argument to the district court or on appeal. And if it had, we are persuaded that Irvin's alleged statement is too slender a reed to support the introduction of the type and amount of prejudicial gang evidence admitted in this case. Irvin's response only indirectly connected the Diablos to the drug transaction, and the government offered no corroboration of the link. Irvin did not say he was delivering the drugs for his gang or to other members of the gang, and there was no evidence to this effect. In addition, Eisenbarger's statement was not uncontroverted or completely unimpeached. Irvin contested the officer's version of the statement, testifying that he had said that the Sons of Silence, not the Diablos, would kill him, and the Trooper admitted that Irvin had mentioned this other gang. Finally and significantly, Irvin's statement was not admitted as to Pastor; the judge instructed the jury that

the answer to the precipitating question was "admitted solely as to the defendant Irvin." Therefore, with respect to the government's case against Pastor, there was no direct or indirect link between the drugs and the motorcycle gang.[5] Lacking any meaningful connection between the Diablos and the drug activity that the government alleged was a joint effort, we must conclude that the probative value of the common gang membership in proving such a joint venture was minimal at best.[6]

On the other hand, the danger of unfair prejudice stemming from the admission of the gang evidence in this case was substantial. Gangs generally arouse negative connotations and often invoke images of criminal activity and deviant behavior. There is therefore always the possibility that a jury will attach a propensity for committing crimes to defendants who are affiliated with gangs or that a jury's negative feelings toward gangs will influence its verdict. Guilt by association is a genuine concern whenever gang evidence is admitted.[7] *See Thomas*, 86

*v. Robinson*, 978 F.2d 1554, 1561–62 (10th Cir. 1992) (evidence of gang membership allowable to prove existence and purpose of drug conspiracy where testimony that main purpose of gang was to sell cocaine), *cert. denied*, 507 U.S. 1034, 113 S.Ct. 1855, 123 L.Ed.2d 478 (1993); *United States v. Sloan*, 65 F.3d 149, 150–151 (10th Cir. 1995) (gang membership admissible to prove existence, purpose, and knowledge of conspiracy where government presented evidence that drug rings were part of the operations of two gangs).

5. Although we do not find Irvin's "gang will kill me" statement sufficient to warrant the introduction of extensive gang affiliation evidence, we believe the statement itself was admissible for other reasons. Irvin's response to the controlled buy proposal was not the response one would expect from a person who had no idea where the drugs had come from or where they were going, i.e., Irvin did not tell the trooper "I cannot participate in a controlled buy because I do not know who to sell the drugs to." Instead, he told the trooper that he could not help because he feared for his life. This is probative of Irvin's intent to distribute the drugs, and it also rebuts Irvin's claim that he had no knowledge of the drugs being in the vehicle. The statement was therefore admissible against Irvin for those purposes.

6. The government offers no other plausible theory as to why the testimony was relevant or proba-

tive. It has directed us to several cases where we held gang evidence admissible because it was directly relevant to proving the defendant's motive for entering into the criminal conduct. *See, e.g. United States v. Hawkins*, 823 F.2d 1020, 1023 (7th Cir.1987); *Rodriguez*, 925 F.2d 1049, 1053–54. We fail to see, however, how the gang testimony presented in this case established a motive for the crime. Additionally, the government weakly argues that the evidence is admissible because it is "inextricably intertwined" with the facts of the case. *See, e.g., United States v. McKinney*, 954 F.2d 471, 479 (7th Cir.), *cert. denied*, 506 U.S. 1023, 113 S.Ct. 662, 121 L.Ed.2d 587 (1992) (gang evidence admissible "to present complete picture of the murder and conspiracy"); *United States v. Hattaway*, 740 F.2d 1419, 1425 (7th Cir.), *cert. denied*, 469 U.S. 1089, 105 S.Ct. 599, 83 L.Ed.2d 708 (1984) (gang "life-style" evidence necessary to provide accurate description of kidnapping victim's "ordeal"). Again, given the lack of relationship between the gang and the drugs here, we are not persuaded by the government's argument.

7. The district court seemed to believe that people in Southern Illinois would not harbor general prejudice against motorcycle gangs, or at least that the prejudice was "highly overrated," since most would not have had experience with motorcycle gangs. While the district court may be in a better position to gauge the general awareness

F.3d at 653–54. This potential for prejudice was heightened in this case because the gang evidence presented consisted of tattoos and clothing containing devil's heads and demonic insignia. In addition, the government's evidence highlighted the name of the gang, the Diablos, which means "devils" in spanish. The introduction of gang membership linked to satanic imagery is clearly inflammatory. The possible prejudicial effect of the gang testimony was further aggravated by the fact that the government had no direct evidence that the defendants were jointly transporting the drugs or were jointly intending to sell them. The highly charged gang-affiliation evidence served as a substitute for such direct evidence, increasing the chance of guilt purely by association. *See United States v. Johnson*, 28 F.3d 1487, 1497–98 (8th Cir. 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 768, 130 L.Ed.2d 664 (1995) (holding gang membership admissible because "it did not substitute for evidence of actual participation in the drug distribution conspiracy"); *Thomas*, 86 F.3d at 653–54 (same).[8] This considerable danger of unfair prejudice more than substantially outweighed the minimal probative value of the motorcycle gang evidence admitted. We therefore conclude that the district court abused its discretion in not excluding the evidence under Rule 403.

█ Even if the district court committed an evidentiary error, we will allow the jury's verdict to stand if we are convinced that the error did not have "a substantial and injurious effect or influence on the jury's verdict." *United States v. Hanson*, 994 F.2d 403, 407 (7th Cir.1993) (internal quotations omitted). We cannot say that the district court's error was harmless as to Pastor's conviction. The government's case against Pastor was far from overwhelming. The only evidence presented against Pastor apart from the gang evidence was the testimony that he was a nervous passenger, who gave a story that

conflicted with the driver's, in a vehicle carrying eight packages of methamphetamine. There was nothing directly indicating Pastor's actual possession of the drugs, his knowledge of the drugs, or his intent to distribute them—Pastor gave no statement to the police and did not take the stand. Given this circumstantial case, we cannot say that the jury's verdict does not reflect any improper inferences drawn from the inflammatory evidence that Pastor was a member of a motorcycle gang that used demonic images as its insignia and was named the devils, and that Pastor himself bore a satanic tattoo.

This is especially true given the prosecutor's statements during the trial and closing argument. The prosecutor consistently used the term "motorcycle gang," specifically choosing it over the far less prejudicial term "motorcycle club," even after the judge instructed him to refrain from using the term "gang." In addition, he openly mocked the use of the term "club" in his questions, clearly suggesting to the jury that the term was a total misnomer for the group. Most importantly, the prosecutor essentially asked the jury to associate criminal activity with the gang and to draw the improper inference of guilt by association. He argued in closing that there was plenty of evidence that Pastor was guilty, as Pastor was a member of a motorcycle gang that wears "dirty, nasty colors and do[es] things," and further that it denies common sense that the Diablos are "an upstanding social group" or "club." This argument was allowed to stand over the objection of the defendants. The prosecutor's obvious attempt to exploit the prejudicial quality of the motorcycle gang evidence almost certainly heightened any impact the improper gang testimony had on the jury's verdict against Pastor.

---

and sentiments of the people in its district, there is no evidence in the record and no voir dire on the issue that supports the court's observation. And given the fact that negative feelings and criminal activity are commonly associated with gangs, including motorcycle gangs, we are unable to adopt the district court's intuitive conclusion.

8. The heightened prejudicial quality of the evidence in this case further distinguishes it from the cases the government cites in support of its argument. In *Lewis*, 910 F.2d at 1372, *Hawkins*, 823 F.2d at 1023, and *Rodriguez*, 925 F.2d at 1053, the evidence admitted was limited and much less inflammatory.

The government's case, absent the gang evidence, was stronger against Irvin. Irvin's statement as to why he could not cooperate and execute a controlled buy indicated that he had knowledge of the drugs and knew to whom they were being sold. Even though the statement, as reported by Eisenbarger, referenced the Diablos, it was sufficiently probative of knowledge and intent to come in for those purposes. *See, supra* n. 6. In addition, both in his statement to the police and his trial testimony, Irvin admitted that he actually possessed the drugs, as he told both the police and the jury that he put the laundry box containing the drugs into the truck. He then told an incredible story, which the jury clearly did not believe, to explain why he put the box in the Bronco. Irvin also claimed ownership of all of the items in the back of the truck, including the guns and knives found.

More importantly, however, Irvin himself introduced evidence of his gang membership in his defense. On the stand, Irvin needed some way to harmonize his story that an unknown man at the gas station had given him the drugs with his statement that a "gang" would kill him if he performed a controlled buy. To accomplish this, Irvin offered his story that he was set up by a former drug-dealing member of the Diablos, who was now a Son of Silence. Irvin therefore admitted that he was a member of the motorcycle club and that he was the president of his chapter. He also admitted ownership of the gang paraphernalia found in the truck. We are convinced that Irvin would have introduced this gang membership evidence even if the government was prohibited from introducing such evidence, because both Irvin's gas station story and his answer to the controlled buy proposition were in response to properly admitted pieces of evidence. We also find it significant that the prosecutor's most overreaching statement occurred during closing argument and was directed mainly at Pastor. Therefore, because the government's legitimate evidence was stronger against Irvin and because Irvin himself introduced prejudicial gang evidence, thereby reducing the impact of the improper gang testimony, and because the prosecutor's aforementioned argument was not directed at

Irvin, we find the court's admission of the gang evidence harmless as to Irvin's conviction.

In conclusion, we AFFIRM Irvin's conviction on all counts and REVERSE Pastor's conviction on counts I and II, as the second count is dependent upon a count I conviction, and we REMAND Pastor's case for a new trial consistent with the principles set forth above.