WR-83, 719-01
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 8/12/2015 10:56:07 AM
Accepted 8/12/2015 11:08:43 AM
ABEL ACOSTA
CLERK

# TEXAS COURT OF CRIMINAL APPEALS

_____

RECEIVED
COURT OF CRIMINAL APPEALS
8/12/2015
ABEL ACOSTA, CLERK

### CASE NO.

### WR-83,719-01

_____

### IN RE STATE OF TEXAS EX REL. MATT JOHNSON
### Relator
### vs.
### COURT OF APPEALS FOR THE TENTH DISTRICT, REAL PARTY IN INTEREST MATTHEW ALAN CLENDENNEN
### Respondent

_____

**Trial Cause No. 2015-1955-2**
**In the 54th District Court, McLennan County**
**Honorable Matt Johnson, Presiding**

**Appellate Cause No. 10-14-00235-CR**
**10th Court of Appeals**
**Waco, Texas**

_____

### RESPONSE TO STATE'S PETITION FOR WRIT OF MANDAMUS

_____

**F. CLINTON BRODEN**
**TX Bar No. 24001495**
**Broden, Mickelsen, Helms & Snipes, LLP**
**2600 State Street**
**Dallas, Texas 75204**
**(214) 720-9552**
**(214) 720-9594(facsimile)**

**Attorney for Matthew Alan Clendennen**

# INTRODUCTION

The Tenth Court of Appeals did not "clearly abuse its discretion." [1] This Court should reject the State's attempt to delay transparency.

It almost appears that the First Amendment to the United States Constitution has been abandoned in McLennan County. First, 177 motorcyclists are rounded up based on "fill-in-the-name complaints" where the alleged probable cause was based almost exclusively on the exercise of their right of freedom of association. Then, after the Waco Police and the McLennan County District Attorney's Office held multiple press conferences before local, national and international media in order to scare the public with horror stories of roving "biker gangs," the District Attorney's office requested a gag order limiting the right to free speech. Moreover, it did so by filing its motion for such an order ten minutes before a totally unrelated hearing so that its statements to **the same media that they had no problem speaking to for several weeks about "biker gangs" could go unchallenged.[2]**

It is only through the strong protection of free speech rights and the "sunlight" provided by the media that Waco and McLennan County citizens can fully evaluate

---

[1] *Dickens v. Second Court of Appeals*, 727 S.W.2d 542, 549-50 (Tex.Crim.App.1987)

[2] *See* Texas Disciplinary Rules of Professional Conduct 3.07, Comment 3 recognizing the possible necessity of making public comments to "counter the unfair prejudicial effect of another public statement."

what occurred at Twin Peaks, the tax dollars it cost, and the actions of their elected officials. Likewise, it is only through robust debate that these citizens can determine whether, in light of the across the board $1,000,000 bonds set in this case in order to "send a message,"[3] they are satisfied with the current state of the law, providing that justices of the peace need not have any formal legal training or whether they believe the legislature should be lobbied to require justices of the peace to have law degrees. Regardless of a taxpayer's ultimate conclusion on the myriad of important societal issues that this case presents, only the strong protection of free speech and a strong media will provide citizens with the background to make these types of evaluations that are imperative to democracy. Simply put, unlike the State which believes the enormity of this case, albeit one of its own making, justifies keeping the public in the dark (except for the "facts" it wanted the public to hear in the days following the incident), Mr. Clendennen believes that the enormity of this case and the issues[4]

---

[3]*See* Appendix 7

[4]Wholesale arrests of 177 people based on "fill-in-the name" warrants, the "unarresting of people arrested, $1,000,000 bonds set in all cases to "send a message" by a lay Justice of the Peace, comments by the District Attorney equating silence with guilt, civil lawsuits, a grand jury headed by a Waco Police detective who apparently participated in the investigation, public comment by a district judge lauding the selection of the police detective to the grand jury, the attempt by the Waco City Attorney's Office to interject itself in criminal proceedings, the concept that third-party evidence (such as Twin Peaks' own copy of its surveillance video) "belongs" to the State, a protective order, a gag order, examining trials that are apparently a rarity to McLennan County, the recusal of a judge, the appointment of a lawyer to represent a judge, group protests by motorcyclists, the cost of the entire incident, etc....

involved counseled against the gag order. The Tenth Court of Appeal agreed.

Although the irony seems to be lost on the State, it argues that it sought the gag order in the first place over its concern about the release of the Twin Peaks surveillance video because it feared that, when they talked to witnesses, "we'll have no idea of knowing what they're telling us [is accurate], if they remember that, if they saw it, or if they watched it [on the Twin Peaks surveillance video]." *See* State's Petition at 2.

What is lost on the State is the fact that, because the police gave almost constant press conferences when these events initially unfolded and because the McLennan County District Attorney went on television to describe "gangs" and explaining to the public that the 177 arrested must be guilty because they were not speaking to the police, the defense will now have no idea whether witnesses are simply parroting what they heard during one of the State's numerous press conferences about "biker gangs."

In sum, it should be obvious to even the casual observer (and was likely apparent to the Court of Appeals) that what the State sought to do was fill the public's mind with pictures of "outlaw biker gangs" and misinformation and when it believed that it sufficiently accomplished that task it sought a gag order.

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................2

TABLE OF CONTENTS....................................................................................5

TABLE OF AUTHORITIES.............................................................................7

STATEMENT OF THE CASE...........................................................................9

STATEMENT OF JURISDICTION.................................................................11

ISSUES PRESENTED.....................................................................................13

STATEMENT OF FACTS...............................................................................14

    I.  The State's Publicity Machine..................................................................14

    II.  The Gag Order Motion..........................................................................15

    III.  The Gag Order.....................................................................................16

    IV.  What the Gag Order Does Not Cover...................................................17

    V.  State Actors Keep Right on Speaking Despite the Gag Order so Only Mr. Clendennen is Effectively Silenced by Judge Johnson's Gag Order.....17

    VI.  The State's "Statement of Fact" Presented to this Court.......................19

SUMMARY OF ARGUMENT.........................................................................22

STANDARD OF REVIEW..............................................................................23

ARGUMENT....................................................................................................24

    I.  The District Court's Gag Order Violated Article 1, Section 8 of the Texas

Constitution and the First Amendment to the United States Constitution...25

    A.  Constitutional Consideration and the Three Key Cases...............25

    B.  Applying the Principles to the Instant Case.................................29

    C.  State's Argument.........................................................................31

PRAYER....................................................................................................34

CERTIFICATE OF SERVICE....................................................................35

CERTIFICATE OF COMPLIANCE...........................................................36

# TABLE OF AUTHORITIES

**Page**

## Cases

*Cook v. State,* 902 S.W.2d 471 (Tex. Crim. App. 1995)......................................11, 12

*Davenport v. Garcia,* 837 S.W.2d 73 (Tex. 1992)....................................25, 26, 27, 31

*DC Waco Restaurant, Inc. D/b/a Don Carlos Restaurant vs. Peaktastic Beverage, LLC D/B/A Twin Peaks Restaurant, et. al.,* No. DC-15-05787....................................17

*Dickens v. Second Court of Appeals*, 727 S.W.2d 542 (Tex.Crim.App.1987).......2, 23

*Ex Parte Clear,* 573 S.W.2d 224 (Tex. Crim. App. 1978)...............................................11

*Ex Parte Port,* 674 S.W.2d 772 (Tex. Crim. App. 1984)...............................................12

*Gentile v. State Bar of Nev.*, 501 U.S. 1030 (1991).................................................24, 33

*In re Benton,* 238 S.W.3d 587 (Tex. App. - Houst. [14th] 2007)........24, 25, 27, 28, 31

*In re Graves,* 217 S.W.3d 744 (Tex. App. - Waco 2007).........................25, 27, 28, 31

*In re Houston Chronicle Pub. Co.,* 64 S.W.3d 103 (Tex. App. Houst (14th 2001)....................................................................................................................27, 31

*Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555 (1980)...................................25

*San Antonio Express-News v. Roman,* 861 S.W.2d 265 (Tex. App. San Antonio 1993).................................................................................................................................25

*State v. Clendennen,* No. 2015-1955-2.................................................................10, 30

*United States v. Irvin*, 87 F.3d 860, 865-66 (7th Cir. 1996)....................................20

*United States v. Schroeder,* 6:93-0046 (W.D. Tex.).....................................................30

*United States v. Tsarnaev,* No 1:13-cr-10200 (D. Mass.)............................................30

## Other Authorities

Article 1, Section 8 of the Texas Constitution.......................................................*passim*

First Amendment to the United States Constitution...............................................*passim*

Louis D. Brandeis, *Other People's Money-and How Bankers Use it* (1914)..............24

Tex. R. Prof'l Conduct Rule 3.07...............................................................................2, 16

## STATEMENT OF THE CASE

Matthew Alan Clendennen was arrested, along with 176 other motorcyclists, at Twin Peaks restaurant in Waco, Texas on May 17, 2015. The arrest was based upon a "fill in the name" criminal complaint where the same complaint was used to arrest 177 people with only the names being changed. *See* Appendix 1.[5]

Mr. Clendennen later sought, via a subpoena *duces tecum*, to obtain a copy of Twin Peaks' own surveillance tape. The subpoena was sought, *inter. alia.*, in connection with motions by Mr. Clendennen to amend his bond conditions. It was sought under the District Court case number 2015-1955-2 which was assigned in connection with Mr. Clendennen's original Application for Writ of Habeas Corpus Seeking Bail Reduction which had previously been granted.

The City of Waco filed a motion to quash the subpoena and the Court set a hearing on the City's motion for June 30, 2015. On the morning of the hearing, the McLennan County District Attorney's Office filed its own motion to quash approximately ten minutes before the start of the hearing and, in that motion, requested a comprehensive gag order be entered. *See* Appendix 3. Ultimately, the District Court found that the City of Waco did not have standing to contest the subpoena, ordered the video to be produced to the defense, and entered the

_____

[5]Except where noted references to the "Appendix" are to the State's Appendix filed in this Court.

comprehensive gag order prepared by the McLennan County District Attorney's Office in *State v. Clendennen*, No. 2015-1955-2. *See* Appendix 4.

On August 7, 2015, the Tenth Court of Appeals entered its unanimous opinion conditionally granting a Writ of Mandamus in this case in the event the District Court did not withdraw the unconstitutional gag order by August 14, 2015 and give written notice to the Court of Appeals that it was doing so.

## STATEMENT OF JURISDICTION

Mr. Clendennen first notes that the District Court did not have jurisdiction to enter the "gag" order in the first place.

This case is pending based upon a criminal complaint signed by a Justice of the Peace. *See* Appendix 1. The gag order was entered in connection with Mr. Clendennen's attempt to obtain, via a subpoena *duces tecum*, a copy of Twin Peaks' surveillance tape. The subpoena was sought, *inter. alia.*, in connection with motions by Mr. Clendennen to amend his bond conditions. It was sought under the District Court case number 2015-1955-2 which was assigned in connection with Mr. Clendennen's original Application for Writ of Habeas Corpus Seeking Bail Reduction which had previously been granted.

The District Court's jurisdiction to consider an Application for Writ of Habeas Corpus and later to amend bond conditions set pursuant to that Application did not give the District Court full jurisdiction to impose a gag order in a case pending before a Justice of the Peace. On point is *Ex Parte Clear*, 573 S.W.2d 224 (Tex. Crim. App. 1978) where the this Court held that, when a criminal complaint is pending before a Justice of the Peace, a district court does not have general jurisdiction to enter orders in the case. Indeed, the filing of an indictment is essential to vest a trial court with jurisdiction over a felony offense. *See Cook v. State*, 902 S.W.2d 471, 475 (Tex.

11

Crim. App. 1995); *Ex Parte Port*, 674 S.W.2d 772, 779 (Tex. Crim. App. 1984).

The simple fact of the matter is that the District Court in this case was only allowed to rule on matters related to Mr. Clendennen's bond conditions pursuant to the Application for Writ of Habeas Corpus he filed. No indictment has been filed against Mr. Clendennen even as of today. Thus, under both *Cook* and *Port*, the District Court was not vested with the authority to enter a wholesale gag order completely unrelated to the bond conditions that were the only proper subject matter of its Writ jurisdiction.

## ISSUES PRESENTED

Whether the Court of Appeals "clearly abused its discretion" in entering its conditional order of mandamus.

# STATEMENT OF FACTS

## I.  The State's Publicity Machine

### A.  Patrick Swanton

On May 17, 2015-May 18, 2015, the Waco Police held at least five different press conferences before local, national and international media painting the indelible image that all members of motorcycle clubs were actually members of "biker gangs." For example, Patrick Swanton, the police spokesperson, told the media:

- If you looked at the motorcyclists on that day "you would know they were not people you wanted to be around."

- The motorcyclists were not at Twin Peaks to "drink beer and eat barbeque."

- The motorcyclists all participated one way or the other in what happened at Twin Peaks.

- The motorcyclists came to Twin Peaks with "violence in mind."

In fact, Officer Swanton repeatedly told the hordes of media that this was the worst crime scene he and other member of law enforcement had witnessed in their careers that spanned several decades.  Also, he described the incident as starting inside the Twin Peaks, however, that was later shown to be false when the Associated Press obtained a copy of the Twin Peaks video and reported on its contents.  *See* Appendix 5 (videos B-D).

### B.  Abel Reyna

Not to be outdone, on May 21, 2015, McLennan County District Attorney Abel Reyna gave an eighteen minute television interview featuring witty sound bites in which he told the media:

- Based on what he saw, nothing was telling him that all 177 motorcyclists were not guilty.

- The motorcyclists were guilty because they were not "acting like victims."

- "I'll bet on our own gang before I bet on their gang."

- The motorcyclists were not at Twin Peaks "just to eat lunch."

- The motorcyclists would not get away with what they did "not in this county, not on my watch."

*Id.* (Video A).

### C. Brent Stroman

On June 12, 2015, Waco Chief of Police Brent Stroman gave a press conference in which he repeatedly reiterated that the police had probable cause to arrest the 177 motorcyclist, that he had seen the video of what happened and he wanted it released to the public because "it would show what happened." *Id*. (Video E).

## II. The Gag Order Motion

As noted above, the State filed its Motion for a Gag Order minutes before a hearing on the City of Waco's motion to quash Mr. Clendennen's subpoena *duces*

15

*tecum* to Twin Peaks to produce a copy of its surveillance video. The entirety of the State's argument in that motion was as follows:

> The State further moves that the court impose a gag order on all parties as the defendant, through his attorney has stated that his intent is not limited to legal proceedings. In a KCEN television interview on June 25, 2015, Attorney Clinton Broden said, "if and when he gets the video, he will make it public. That's the plan," said Broden. The State requests that the Court order all parties involved in this case to strictly adhere to the letter and spirit of the Texas Disciplinary Rules of Professional Conduct governing Trial Publicity. Specifically all attorneys shall refrain from making "extrajudicial statements that a reasonable person would expect to be disseminate by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicatory proceeding." Tex. R. Prof'l Conduct Rule 3.07

*See* Appendix 3. The only media attached to the motion was the KCEN article referenced in its motion.

## III. The Gag Order

The District Court's gag order, prepared by the District Attorney's Office, took judicial notice of:

1) the usually emotional nature of the issues involved in the case;

2) the extensive local and national media coverage the case has already generated; and

3) the various and numerous media interviews with counsel for the parties that have been published and broadcast by local and national media.

*See* Appendix 4. Based upon this alone the District Court ordered a complete gag

16

order on 1) the parties in the *Clendennen* case; 2) the attorneys in the *Clendennen* case; 3) law enforcement as it relates to the *Clendennen* case; and 4) any witnesses in the *Clendennen* case that previously made statements to law enforcement or the District Attorney's Office.

## IV.  What the Gag Order Does Not Cover

In the State's haste to get a gag order in place, what the gag order did not cover is almost important as to what it did cover.

First, it did not cover

1) the parties in the 176 other motorcyclist cases;

2) the attorneys, including the District Attorney's Office, in the 176 other motorcyclist cases;

3) law enforcement as it relates to the 176 other motorcyclist cases; and

4) any witnesses in the 176 other motorcyclist cases that previously made statements to law enforcement or the District Attorney's Office.

Next, the gag order did not cover the parties in the litigation in the 54th District Court of Dallas County between Twin Peaks and a neighboring restaurant over whether the neighboring restaurant loss business as a result of what happened at Twin Peaks.  *See DC Waco Restaurant, Inc. D/b/a Don Carlos Restaurant vs. Peaktastic Beverage, LLC D/B/A Twin Peaks Restaurant, et. al.*, No. DC-15-05787.

## V.  State Actors Keep Right on Speaking Despite the Gag Order So Only Mr. Clendennen Is Effectively  Silenced by Judge Johnson's Gag Order

17

After the entry of the gag order, McLennan County sat its grand jury that could consider Mr. Clendennen's case. *See* Appendix 6 to Supplement to Emergency Petition for Writ of Mandamus. The foreperson of that grand jury is Waco Police Detective James Head who claimed he was "'not really'" involved in the investigation including Mr. Clendennen's case. *Id* At the time of the seating of this grand jury, Mr. Clendennen and his counsel were subject to the gag order entered by the Judge Matt Johnson and could publicly speak to this matter of grave public concern to our justice system. Nevertheless, the Judge of the 19th District Court, Ralph Strother, gave media interviews in which he basically lauded Detective Head's selection. *See* Appendix 6 ("Who is better qualified in criminal law than somebody who practices it all the time?").

**In that same news article District Attorney Abelino Reyna also went right on speaking despite having requested the gag order. He told the media: "That's the system. He was chosen totally at random, like the law says." *Id*.**[6]

On or about July 28, 2015, an attorney hired by McLennan County to represent Justice of the Peace W.H. "Pete Peterson" made extensive comments to the *Waco Tribune Herald* regarding the possible appointment of an out-of-county judge for Mr. Clendennen's examining trial following a finding that Judge Peterson must be

___

[6]Certainly the District Attorney's Office does not come to this Court with "clean hands."

18

recused. *See* Appendix 7 to Second Supplement to Emergency Petition for Writ of Mandamus. So again, while Mr. Clendennen and his counsel were subject to the gag order entered by the Judge Johnson, the agent for Judge Peterson was permitted to give statements to the press at will.

## VI. The State's "Statement of Fact" Presented to this Court

The State's Petition to this Court ("State's Pet.") actually highlights almost everything that was wrong with the "gag order" in this case. Indeed, it purports to give this Court "facts" of the case that it claims are "facts" because these "facts are "what [is] "commonly known through press reports...." *See* State's Pet. at 7. The State then cites to press conferences held by state actors that are contained in Mr. Clendennen's Appendix to support these alleged "facts."

For example, despite the fact that Mr. Clendennen belongs to the Scimitars Motorcycle **Club**, the State cites its own repeated press conferences in order to allow it to repeatedly refer to these "clubs" as "five outlaw biker gangs." *See* State's Br. at 1. Indeed, the word "gang" appears in the State's Petition **ten times** in an apparent attempt to prejudice this Court, just as the State initially attempted to prejudice the public against Mr. Clendennen. [7]

---

[7]This tactic was strongly condemned by the United States Court of Appeals for the Seventh Circuit.

Gangs generally arouse negative connotations and often invoke images of criminal

Not content to simply label the "clubs" to be "gangs," the State also tells the Court that it is a "fact" that "law enforcement intelligence had discovered that a 'green light' had been given by certain criminal organizations to take retribution against law enforcement and/or members of rival gangs." *See* State's Pet. at 1, 8. What evidence does the State cite for this damning "fact?" **Its own press conferences!**

Similarly, the State also cites its own press conference reciting the number of weapons secured from motorcyclists at Twin Peaks (*see* State's Pet. at 8) without also

---

activity and deviant behavior. There is therefore always the possibility that a jury will attach a propensity for committing crimes to defendants who are affiliated with gangs or that a jury's negative feelings toward gangs will influence its verdict. Guilt by association is a genuine concern whenever gang evidence is admitted....

\* \* \* \*

This is especially true given the prosecutor's statements during the trial and closing argument. **The prosecutor consistently used the term "motorcycle gang," specifically choosing it over the far less prejudicial term "motorcycle club,"** even after the judge instructed him to refrain from using the term "gang." In addition, he openly mocked the use of the term "club" in his questions, clearly suggesting to the jury that the term was a total misnomer for the group. Most importantly, the prosecutor essentially asked the jury to associate criminal activity with the gang and to draw the improper inference of guilt by association. He argued in closing that there was plenty of evidence that Pastor was guilty, as Pastor was a member of a motorcycle gang that wears "dirty, nasty colors and do[es] things," and further that it denies common sense that the Diablos are "an upstanding social group" or "club." This argument was allowed to stand over the objection of the defendants. **The prosecutor's obvious attempt to exploit the prejudicial quality of the motorcycle gang evidence almost certainly heightened any impact the improper gang testimony had on the jury's verdict against Pastor.**

*United States v. Irvin*, 87 F.3d 860, 865-66 (7th Cir. 1996) (emphasis added).

mentioning that this number was a moving target ripe with police hyperbole as to the number of weapons and whether things such as wallet chains could actually credibly be called weapons. This was evidenced by the different numbers given at the different press conference held by the State.

## SUMMARY OF THE ARGUMENT

The gag order imposed in this case violated Mr. Clendennen's right to free speech under both the Texas Constitution and the United States Constitution. The findings made by the District Court in adopting the State's gag order were insufficient to establish that any unidentified pretrial publicity in this case had risen to the level that it posed "imminent" and "severe" harm to a "fair and impartial trial.'" More importantly, given the unique nature of the case, which has 176 identical companion cases, a gag order was likely to be ineffectual and was not the "lest restrictive means" to prevent any identified harm.

The Tenth Court of Appeals did not abuse its clearly abuse its discretion in granting the conditional Writ of Mandamus in this case.

## STANDARD OF REVIEW

While not discussed in the State's Petition for Writ of Mandamus and Motion to Stay Writ of Mandamus, it must be noted that this Court applies "the clear abuse of discretion" standard for reviewing the mandamus action of a court of appeals. *Dickens* 727 S.W.2d at549-50 (Tex.Crim.App.1987)

## ARGUMENT

Whether real or perceived, there is a noxious odor surrounding the investigation by the Waco Police and the McLennan County District Attorney's Office with regard to the "Twin Peaks Shooting" and the wholesale arrest of 177 motorcyclists based on identical, "fill-in-the-name" criminal complaints. Nevertheless, as Justice Brandeis said: "Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman." Louis D. Brandeis, *Other People's Money-and How Bankers Use It* (1914).

This sentiment is still recognized today by both federal and state courts. As noted by the United States Supreme Court and discussed in *Benton*, "the criminal justice system exists in a larger context of a government ultimately of the people, who wish to be informed about happenings in the criminal justice system, and, if sufficiently informed about those happenings, might wish to make changes in the system." *Gentile v. State Bar of Nev.,* 501 U.S. 1030, 1070 (1991).

> **The judicial system, and in particular our criminal justice courts, play a vital part in a democratic state, and the public has a legitimate interest in their operations**. "[I]t would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted." Public vigilance serves us well, for "[t]he knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power....

24

Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account." As we said in *Bridges v. California*, limits upon public comment about pending cases are "likely to fall not only at a crucial time but upon the most important topics of discussion....["]

*Id*. at 1035 (citations omitted) (emphasis added).

It is against this backdrop that the State asks this Court to grant a Writ of Mandamus against the Tenth Court of Appeals.

## I.  The District Court's Gag Order Violated Article 1, Section 8 of the Texas Constitution and the First Amendment to the United States Constitution.

### A.  Constitutional Consideration and the Three Key Cases

The seminal case on gag orders in the State of Texas is *Davenport v. Garcia*, 834 S.W.4 (Tex. 1992). Although that is a civil case, its holdings have been repeatedly applied to gag orders imposed in criminal cases. *See Benton*, 238 S.W.3d at 594; *In re Graves*, 217 S.W.3d 744, 753 (Tex. App.-Waco 2007); *San Antonio Express-News v. Roman*, 861 S.W.2d 265, 268 (Tex. App. San Antonio 1993). Indeed, as noted in *Graves*, this Court "often relies on the decisions of the Supreme Court of Texas when addressing matters of state constitutional law." *Graves*, 217 S.W.3d at 749.[8]

---

[8]If anything, gag orders should face even stricter scrutiny in criminal cases because "it would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 574 (1980).

The Texas Supreme Court in *Davenport* made clear that, despite the broad freedom of speech protections given United States citizens under the First Amendment to the United States Constitution, Article 1, Section 8 of the Texas Constitution gives even greater free speech protections to citizens of our state. *Davenport*, 834 S.W.2d at 12 ("When a state court interprets the constitution of its state merely as a restatement of the Federal Constitution, it both insults the dignity of the state charter and denies citizens the fullest protection of their rights."); *Id.* at 7 ("The history of [Article 1, Section 8 ] provision is a rich one, and its language demonstrates Texas' strong and longstanding commitment to free speech. By the plain language of our constitution, this fundamental liberty 'shall forever remain inviolate.'").

The Texas Supreme Court held that, to justify a gag order, it must be shown (1) that, without the gag order, an imminent and irreparable harm to the judicial process will deprive litigants of a just resolution of their dispute, and (2) the judicial action represents the least restrictive means to prevent that harm. *Id*. at 10. In fact, with regard to the first prong, the Supreme Court made clear that the harm must be "imminent" and "severe." Ultimately, the *Davenport* court found that a gag order providing:

> 1. Counsel in this case, present and former, are expressly ORDERED to refrain from discussing or publishing in writing or otherwise, any

matters of this case with any persons other than their clients, agents, or employees in the necessary course of business in this case.

2. Counsel is ORDERED to refrain from any public comment, casual or otherwise concerning the facts of this case or the conduct of counsel in this case other than in a court hearing.

violated the right to free expression guaranteed under the Texas Constitution. *Id*. at 11. ("'[T]he argument of convenience can have no weight as against those safeguards of the constitution which were intended by our fathers for the preservation of the rights and liberties of the citizen.'" (citation omitted)).

Following the Texas Supreme Court's *Davenport* case, there were two cases where gag orders were challenged by a criminal defendant that are on point. The first was *Benton* from the Fourteenth Court of Appeals and the second was *Graves* from this Court. These two cases can be immediately distinguished from *In re Houston Chronicle Pub. Co.*, 64 S.W.3d 103 (Tex. App. Houst (14th 2001), one of the only cases upholding a gag order, because in that case (the Andrea Yates case) "the prior restraint on speech was not the subject of a constitutional challenge from any individual who was the subject of the order." *Benton*, 238 S.W.3d at 601, n. 25.[9]

*Benton* involved a gang fight in Houston. *Benton*, 238 S.W.3d at 588. The

_____

[9]Nevertheless, as an indication that little reflection was given to the serious free speech implications of the gag order imposed in the instant case, the instant gag order has identical findings as the gag order in *Houston Chronicle*. It stands to reason that the free speech principles announced in *Davenport* do not permit "one size fits all" gag orders.

State requested a gag order and, much like here, alleged that the defense made "extra judicial statements to the media" that violated the Texas Disciplinary Rules of Professional Conduct. *Id*. at 951. After the District Court entered a comprehensive gag order, the defendant sought mandamus and argued that the gag order violated her free speech rights under the Texas Constitution and that the evidence was insufficient to establish the likelihood of the required level of prejudice to the integrity of the judicial process or the imminence of any such harm. *Id*. at 592.

The *Benton* court ultimately determined that the gag order was unconstitutional even under the slightly more lenient First Amendment test because the trial court's findings when imposing the gag order did not "establish, as a 'constitutional minimum,' that the order was narrowly-tailored to avert a substantial likelihood of material prejudice." *Id*. at 597. It first noted that the gag order "primarily focused on relator's right to a fair trial and an impartial jury." *Id*.[10] It then noted that the district court "presumed that publicity is inherently prejudicial to a criminal defendant." *Id*. The *Benton* court ultimately determined that the district court abused its discretion in entering the gag order at issue in that case. *Id*. at 601.

*Graves* dealt with the following findings in connection with a gag order:

1. The prior proceeding in this cause of action, and other related actions

---

[10]This is similar to the instant gag order which purports to be concerned with "pre-trial publicity that will interfere with *the defendant's* right to a fair trial by an impartial jury."

of which the Court takes judicial notice;

2. The pre-trial publicity which has already occurred in this case, which includes local and national newspaper coverage, of which the Court takes judicial notice;

3. The rulings and opinions which set out the inherent power of the Court to control its own proceedings, and to assure that a fair trial is provided for the State and the Defendant in this cause;

4. Whereupon the Court does find that it is necessary to enter this Restrictive Order to protect and provide for a fair and impartial trial in this cause of action.

*Id*. at 746. Like Mr. Clendennen, "Graves at least implicitly dispute[d] that pretrial publicity in his case ha[d] risen to the level that it pose[d] 'imminent and irreparable harm' to a 'fair and impartial trial.'" *Id*. at 752 Ultimately, this Court concluded that the Respondent trial judge " failed to make 'specific findings' detailing the nature or extent of the pretrial publicity in Graves's case or how the pretrial publicity or the record from his prior prosecution will impact the right to a fair and impartial jury." *Id*. at 752-53.

### B. Applying the Principles to the Instant Case

It appears the State believes that it is consistent with constitutional principles for it to be allowed to give repeated interviews designed to portray 177 member of motorcycle clubs to be "gang members" who came to Twin Peaks on May 17, 2015 only with "violence in mind" and not "just to eat lunch." Then the State believes that

ten minutes before an unrelated hearing it can, for the first time, complain about the publicity that casts its previous accounts of what occurred at Twin Peaks into serious doubt. **The unvarnished truth of the matter is that the State had absolutely no concern with "the paramount importance of the trial rights of Mr. Clendennen" (*see* State's Br. at 13) when it held its repeated press conferences earlier in this case and certainly its concern now for "the defendant's right to a fair trial by an impartial jury" is transparently hollow.**

Moreover, in this case, a gag order was simply impossible and unworkable given the State's decision to charge 177 motorcyclists in identical criminal complaints. As noted above, the gag order only applied to attorneys and parties in *State v. Clendennen*. It did not apply to the attorneys and parties in the other 176 cases.[11] Moreover, it did not apply to related litigation occurring in other state and federal courts. Ultimately, the gag order would collapse under the unprecedented action by the State to charge 177 with the exact same offense.[12]

---

[11]Technically, the District Attorney's Office and the Waco Police could continue to have press conference and simply preface any remarks with "this just applies to the other 176 bikers and not Matthew Alan Clendennen."

[12]To put the gag order in this case, which was entered only a month after Mr. Clendennen's arrest, into perspective, a review of the docket sheets in the Branch Davidian case reveals that a "gag order" was not entered until approximately eight months after charges were filed and just shortly before trial. *See United States v. Schroeder*, 6:93-cr-00046 (W.D. Tex). Moreover, in the "Boston Bomber" case there does not appear to have been any gag order entered. *See United States v. Tsarnaev*, No. 1:13-cr-10200 (D. Mass.).

## C. State's Argument

Despite the fact that there are three important gag order cases,[1] the State's Petition to this Court only addresses the gag order in *Graves*.[2] The State also discusses *In re Houston Chronicle Pub. Co.* As noted above, in *Houston Chronicle*, "the prior restraint on speech was not the subject of a constitutional challenge from any individual who was the subject of the order." *Benton*, 238 S.W.3d at 601, n. 25. Thus, *Houston Chronicle* is immediately distinguishable.

Second, in discussing whether the gag order in this case was "narrowly tailored" and whether it met the "least restrictive means" test, the State simply tells the Court that it "seems self-evident" at to why the gag order is the least restrictive means to accomplish the goals sought by the gag order. *See* State's Br. at 10.

Pretrial publicity rarely is so unfairly and incurably prejudicial to a particular defendant as to deny to him the right to an impartial jury. In many high-profile criminal cases—including those involving the Watergate defendants, the platoon leader in the My Lai massacre in Vietnam, and Enron executive Jeffrey Skilling—*voir dire* of prospective jurors sufficiently guarded against prejudice Indeed, as a realistic

---

[1] *See  Davenport v. Garcia*, *supra.*; *In re Benton, supra.*; *In re Graves*, *supra.*

[2] To be sure, the State discusses the standard of review announced in *Davenport* and makes a passing reference to *Benton*, but it never discussed the ultimate holding in those cases overturning gag orders.

matter, Mr. Clendennen's trial, if he is even indicted, is at least a year a way. It is not at all "self evident" why a gag order is needed to protect a case not even indicted and which would not go to trial in the near future and why "searching" *voir dire* and "emphatic' jury instructions are not constitutionally preferable alternatives.

Third, the State does not address the efficacy of a gag order at all given that the District Court's gag order did not apply to the 176 other defendants, the State in the other 176 cases, any of the litigants in the related civil cases, nor the McLennan County judges such as Judge Strother and Justice of the Peace Peterson who made comments to the press after the entry of Judge Johnson's gag order.

Fourth, the State's Petition almost proves the point at to why this gag order was unworkable and failed to provide proper notice. The State appears to recognize a distinction in the gag order between "*discussion* with the media" and *"statements* to the media." *See* State's Br. at 9. Under the State's reading of the gag order, the parties could make *statements* to the media as long as did not violate the Texas Disciplinary Rules of Professional Conduct but they couldn't have *discussions* with the media. Apparently, under the State's reading, it was free to call members of the media and tell them, "Don't ask me any questions because I can't have *discussions* with you, but I can make *statements* so listen closely."

Fifth, the State tells the Court that "it would behoove the Court" to recognize

32

what the State perceives to be the uniqueness and enormity of this case. *See* State's Pet. at 9. Again, the irony is lost on the State. There have, of course, been other situations like this with mass deaths and injuries (for a recent example one need only look to the Boston Marathon bombings where it does not appear a gag order was imposed). Nevertheless, in those other situations the police did not overreact and arrest almost everybody at the scene of the crime whether or not they were simply innocent witnesses such as Mr. Clendennen. The unprecedented overreaction and civil rights violations using "fill-in-the-name" arrest warrants to arrest and detain numerous innocent individuals is a mess of the State's own making and the enormity of it is one of the very reasons that a gag order infringes on important free speech rights. *Gentile* 501 U.S. at 1070 (1991) ("The judicial system, and in particular our criminal justice courts, play a vital part in a democratic state, and the public has a legitimate interest in their operations.").

Finally, the State expresses concern regarding the "lack of analysis by the Tenth Court." *See* State's Br. at 13. Mr. Clendennen submits that the terseness of the Tenth Court of Appeals' opinion can be attributed to the fact that the precedent supporting its granting of the conditional writ was so clear as to make "reinventing the wheel" unnecessary and can also be attributed to the need to act with alacrity given the important free speech rights at stake.

## **PRAYER**

The Waco Court of Appeals did not "clearly abuse its discretion" in granting its Conditional Writ of Mandamus and, therefore, the States Petition and Motion to Stay should be denied.    .

Respectfully submitted,


/s/F. Clinton Broden
F. CLINTON BRODEN
TX Bar No. 24001495
Broden, Mickelsen, Helms & Snipes, LLP
2600 State Street
Dallas, Texas 75204
(214) 720-9552
(214) 720-9594(facsimile)

Attorney for
Matthew Alan Clendennen

## CERTIFICATE OF SERVICE

I, F. Clinton Broden, do hereby certify that, on this 12th day of August, 2015,

I caused a copy of the foregoing document to be served by electronic means, on:.

Honorable Matt Johnson
54th District Court
501 Washington Ave., Suite 305
Waco, Texas 76701

McLennan County District Attorney
219 N 6th St
Waco, Texas 76701

Tenth Court of Appeals
501 Washington Ave.
Waco, Texas 76701


/s/ F. Clinton Broden
F. Clinton Broden

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Tex. R. App. P.9.4 because this brief contains __6,050__ words, excluding the parts of the brief exempted by the rule.


/s/ F. Clinton Broden
F. Clinton Broden